EMILE C. BERCKMANS *vs.* SARA E. BERCKMANS.

1. The evidence of an alleged paramour, being *particeps criminis* is but weak. But neither his evidence, nor that of the woman charged with adultery, is to be rejected òn the *assumption* that they are guilty.

2. Express testimony cannot be rejected on the sole ground of its improbability. Its *impossibility* alone can discredit the witness.

3. A witness must state *facts*, not inferences, and the court can draw no inference, which the facts as proved do not justify.

4. The testimony of one witness uncorroborated, unsupported, and in its details improbable, is not sufficient to establish the charge of adultery, against the full and explicit counter testimony of the person accused and her *particeps criminis*.

5. It is not necessary that the offence should be proved in time and place as charged in the bill. The mind of the court must be *satisfied* that actual adultery has been committed, but if the circumstances establish the fact of general cohabitation, it is enough, although the court may be unable to decide at what time the offence was committed.

6. *Parol evidence* of the declarations of a *particeps criminis*, even though he has confessed his guilt, is not competent evidence against the party charged with adultery.

7. To establish the existence of adultery, the circumstances must be such as would lead the guarded discretion of a reasonable and just man to that conclusion. It must not be a rash and intemperate judgment, moving upon appearances that are equally capable of two interpretations.

8. The facts proven must be such as can not be reconciled with probability and the innocence of the parties.

·9. Mere imprudence, indiscretion, or folly, is not conclusive evidence of guilt. The mind of the court must be *satisfied*, that there was an intimacy between the parties entirely inconsistent with the duty which a virtuous wife owes to herself and to her husband.

10. When the conduct of a party admits of two interpretations equally consistent with probability, the one involving guilt and the other consistent with innocence, the rules of evidence as well as the dictates of justice require that the interpretation should be favorable to innocence.

11. In the investigation of a wife's guilt, the conduct of the husband is always regarded as a most significant circumstance. So long as there is reasonable doubt of her guilt, or a plausible ground for a hope of her innocence, the husband's forbearance is both excusable and laudable. But when the husband holds in his hands what he claims to be satisfactory proof of his wife's guilt, his delay to prosecute is strong evidence in the wife's favor.

12. To prove adultery by circumstantial evidence, two points are to be established; the opportunity for the crime, and the will to commit it. Where both are *established*, the court will infer the guilt.

*Williamson* and *Frelinghuysen*, Attorney General, for complainant.

*Titsworth* and *Parker*, for defendant.

THE CHANCELLOR. The bill is filed by the husband against the wife for a divorce, on the ground of adultery. The parties were married at Plainfield, in this state, where they both resided, on the eighth of February, 1858. At the time of the marriage the husband was about twenty-three, and the wife twenty-one years of age. Two children were born of the marriage, *viz.* a son, who was born near Augusta, Georgia, where the parties temporarily resided, on the eighteenth of February, 1859, and a daughter, born at Plainfield, on the third of April, 1860. They continued to cohabit as man and wife until September nineteenth, 1860, when the wife left the house of her husband, with her two children, and went to the city of New York, where she remained about ten days, when she returned with the children to Plainfield, and went to reside with her mother.

On the fourteenth of November, 1860, she filed her petition in this court asking a divorce *a mensa et thoro* from her husband, on the ground of extreme cruelty, and charging that she was compelled to leave his house in consequence of his ill-treatment, which became unendurable. On the sixteenth of January, 1861, the wife filed her petition for alimony *pendente lite*, which was granted on the fifth of February thereafter. On the last named day, the bill in this cause was filed by the husband, asking a divorce *a vinculo matrimonii*, on the ground of adultery. The further prosecution of the suit, instituted by the wife, was thereupon suspended, and the suit of the husband is now brought to final hearing upon the pleadings and proofs.

The adultery is charged to have been committed on different days in the months of May, June, July, August, September and October, 1859, and in the months of June and September, 1860, with one Randolph Titsworth, and with other persons unknown to the complainant. The answer fully denies the charge of adultery, re-affirms the charges of cruelty preferred against the husband in her bill of complaint against him, and also the charge that she was compelled by his ill-treatment to leave his house.

The simple question in the case is, whether the evidence is sufficient to support the charge of adultery. The complainant offers both direct and circumstantial evidence of the charge; direct evidence I mean of facts, from which the conclusion of guilt is a necessary and unavoidable inference.

I. As to the direct evidence. Mrs. Maria E. Berckmans, the mother of the complainant, testifies that in June, 1859, she saw the defendant lying on the sofa in the parlor, and Dr. Titsworth lying on her. She further testifies, that in the fall of the same year, she saw the defendant sitting on a chair in her bed-room dressed in a loose sack, with her neck and bosom exposed, and Dr. Titsworth sitting close by her in another chair, with one of his arms lying on the defendant's neck, and kissing her. His other hand had hold of one of the defendant's hands, and was lying on her lap. The witness adds: "I stayed looking at them only one moment, till the defendant got up, and he put both arms around her and kissed her, and then I went away." If this testimony is true, it precludes the necessity of further investigation. All speculation as to the guilt or innocence of the defendant is at an end. But the defendant and the alleged *particeps criminis* have been examined. They both utterly and most explicitly deny the truth of the charge. Dr. Titsworth testifies, in regard to the parlor scene: "I never was lying upon the sofa, neither was Mrs. Berckmans, in my presence. There is no truth in the statement of the witness. * * * I pronounce her statement in regard to the bed-room scene

emphatically false. There is not the first particle of truth in it whatever. There is no foundation for it. I believe I never was in that room alone with her in my life. I was never in any room with Mrs. Berckmans in the position her mother-in-law described, or in any indecent or improper position." The defendant herself is equally emphatic in her denial of the truth of the charge. Neither of these witnesses is entitled to the credit of fair and impartial witnesses. It is not an unnatural presumption, if parties are guilty of adultery, that they will not hesitate to resort to perjury to conceal their guilt. The alleged paramour being *particeps criminis*, his evidence is but weak. 2 *Greenl. Ev.*, § 46. But their evidence is not to be rejected on the assumption that they are guilty. In the absence of very clear evidence of their guilt, their evidence is to be fairly weighed and considered. We have then the testimony of both the parties implicated, against the evidence of the one witness on the part of the complainant. How far is her testimony corroborated, or discredited by circumstances, or by other evidence in the case?

1. The complainant's witness states that the sofa upon which the transaction occurred in the parlor, stood on the side of the room, opposite to the door, with the back of the sofa against the fire place. The defendant alleges, and offers evidence to prove, that in June, 1859, at the time of the alleged transaction, the sofa stood on the opposite side of the room, behind the door. It is clearly shown that the place usually occupied by the sofa, was against the mantel. It is shown, I think with equal clearness, that during a part of the summer of 1859, it stood on the opposite side of the room. But when it was removed, or where it stood in the month of June, 1859, is not ascertained by the evidence with sufficient clearness to discredit the testimony of the complainant's witness.

2. It is insisted on the part of the defence, admitting the sofa to have stood where the witness alleged it did, that it was physically impossible for her to have seen from the posi-

L *

tion which she says she occupied, either the transaction in the parlor or in the bed-room. These objections were the result of investigations made under the direction of counsel, and were doubtless made in good faith, and with a full conviction of their truth. The high professional character of the counsel, no less than the circumstances under which they were presented, forbids the idea that they were raised or urged with any unfair purpose, or otherwise than with a full conviction of their truth.

The witness stated that she saw the transaction in the bedroom through the window of her dressing-room and through the window of the bed-room. Respectable witnesses, after repeated experiments, testified that they were utterly unable to see any object in the bed-room, looking through the windows of the two rooms, or even by opening the window of the dressing-room. Other witnesses testified that objects could be distinctly seen from one room to the other, looking through both windows. The witnesses on both sides testified with equal confidence and manifestly with equally firm convictions of the truth of their respective statements. And in the earlier stages of the evidence there was a serious and apparently irreconcilable conflict in the testimony. But in the progress of the testimony, the cause of the difficulty has been satisfactorily explained. The window of the dressing-room opened to the east, the window of the bed-room to the south, at the distance of two or three feet from the dressing-room window. The line of vision was such that the external light falling upon the glass of the window of the bed-room obliquely, was reflected to the eye of the observer, thus converting the window into a mirror, and leaving the room beyond in utter darkness. By partly closing the shutter of the window on the side opposite to the observer, so as to prevent the reflection, the whole difficulty was avoided, and objects within the bed-room rendered clearly visible. This objection to the credibility of the witness is thus removed. Simple as the solution now seems, it was not discovered till much testimony on the point had been taken. The witness

had testified that it was a bright day, and the windows had been thrown open, so that the room was very light. Looked at apparently under the same conditions of light nothing could be seen, and the counsel of the defendant strenuously insists that this arrangement of the shutter was an after-thought, a mere fraudulent contrivance to remove an otherwise insuperable objection to the credibility of the testimony, and that it is in the highest degree improbable that the witness should have seen this transaction under the precise conditions which alone would have enabled her to see it. This objection may be entitled to consideration in weighing the probability of her evidence. But for the purpose of discrediting the witness, the whole force of the objection consists in the position that it was *impossible* for her to see. Express testimony cannot be rejected on the sole ground of its improbability.

3. The witness further testified that she saw the transaction upon the sofa in the parlor, from the green-house, through a window which opened into the green-house from the parlor. The sofa stood under the mantel, with its back against the breast work of the chimney, and toward the side of the room in which the window was. But a small part of the end of the sofa projected beyond the breast work of the chimney, so that a large portion of the sofa was entirely concealed from the view of a person at the window. The back of the sofa at the end was high, and was directly in the line of vision between the window and the seat of the sofa. Careful measurements have been made and furnished, with a diagram, to the court, the accuracy of which are not called in question, and which, it is insisted, render it demonstrably certain that the witness could not have seen persons lying on the sofa as she testified. The witnesses on the part of the defendant, by whom the premises were examined, testify that the experiment was made and repeated in their presence, and that a person lying on the sofa could not be seen from the position in which the witness stood. Other witnesses of equal respectability, by whom the premises were subsequently

examined, testify not only that a person lying on the sofa may be seen, but that the seat of the sofa itself may be seen by a person looking over the back.   This seems to me to be incredible, assuming that the observations in both cases were made under the same conditions and were fairly made and stated; and physically impossible, if the measurements furnished to the court were accurate.   I confess that I am totally unable to reconcile this conflict in the testimony except upon the hypothesis, either that there was some change in the relative elevation of the floor of the green-house and parlor, so that the position of the observer and altitude of the point of vision was changed, or that a change was made in the sofa itself.   The latter is the theory of the defendant's counsel. He insists that when the complainant's witnesses were called to examine the premises, another sofa with a lower back was fraudulently substituted, by which device the witnesses were innocently and unwittingly induced to give evidence necessarily calculated to pervert the truth and mislead the court.   Evidence is offered tending to support this view of the case.   But I do not choose to rest the decision of this point in any degree upon this ground, involving as it necessarily does the imputation of fraudulent conduct to the complainant.   It seems entirely unnecessary to do so.   The first examination of the premises by the defendant's witnesses was made before the cross-examination of the complainant's witness, Mrs. Maria E. Berckmans, was closed.   The examination and experiments were made in her presence.   She took part in making them, and when it became obvious that a person lying on the sofa could not be seen from the position in the green-house which she occupied standing on the floor, she said that she stood upon a chair, and showed where she procured the chair, and where she placed it.   She alleged that her daughter-in-law wore hoops, which raised her dress very much above the seat of the sofa, which enabled her to see the skirt of her dress.   And when recalled to the stand and her cross-examination resumed, the witness says : " the sofa of which I have spoken, is the same sofa now in the

room ; it was standing as it now does. I saw no part of Mrs. Berckmans' person. I saw only a part of her dress. I couldn't tell what part." And in answer to the question whether she saw any part of Dr. Titsworth's person, she answers : " I saw Dr. Titsworth's feet, his boots, and the feet lying on the sofa, on the same side of the sofa where I was looking through the window." Now it is admitted that next to the window of the green-house, a part of a boot of a person lying on the sofa might be seen. There is a very abrupt descent of the back of the sofa as it curves at the end, forming a low arm, six to nine inches in length from the curve of the back, and only nine inches in height. At that point, the boots of a person on the sofa might be seen. This is all the witness on her cross-examination pretends she saw. It is needless to say it is a most serious alteration of her original testimony, that she saw these persons lying together on the sofa. Her statement of what she saw may be literally true, and yet her inference totally groundless. Nor does it relieve the difficulty, to say that she may have seen the boots and the dress in a position to justify her inference. A witness is to state facts, not inferences, and the court can draw no inference which the facts as proved do not justify. While this evidence, therefore, does not utterly discredit the witness, it goes far to shake the reliability of her testimony. It shows that what she originally swore she saw was a physical impossibility, and that after that fact had been ascertained, her evidence was so modified to meet the emergency as to render it of little or no significance. While, therefore, the evidence of the defendant is not sufficiently decisive utterly to discredit the witness, it goes far to shake the reliability of her testimony, and to require that it should be closely scrutinized.

I turn, therefore, to other aspects of the evidence of the witness, and of the attendant circumstances, which I deem of importance as effecting her credibility. This transaction is alleged to have occurred in June, 1859. At that time and for months afterwards, not the least intimacy is shown to

have existed between these parties. The complainant was married on the eighth of February, 1858. His wife, at the time of the marriage, was twenty-one years of age, and resided in Plainfield, with her mother. Her position in life was humble. Her mother kept a small fancy store. The daughter taught music in private families in Plainfield, and acted as organist of the Episcopal Church. So far as appears from the evidence, she had won for herself the respect and confidence of the community. After her marriage she remained in Plainfield with her husband until the nineteenth of September following, when they went to Georgia, where her first child was born, on the eighteenth of February, 1859. Near the close of April, 1859, she returned to Plainfield with her husband and infant, and went to reside with her mother-in-law, Mrs. Maria E. Berckmans, both families using in common a parlor adjoining the main hall of the house, upon the first or lower floor. Dr. Titsworth, with whom the adultery is alleged to have been committed, was a physician practising in Plainfield. He was a married man, over forty years of age, a father, and the member of a Christian church. He had been the physician of Mrs. Berckmans before her marriage. He was called to attend her after her return from the south, and did so at the house of the mother-in-law. No particular intimacy is shown to have existed between them at this period, except from the evidence of Mrs. Maria E. Berckmans herself. There is not in the evidence a whisper unfavorable to the reputation of either of these parties, or to the character of their intercourse, except from the lips of the mother-in-law. Is it probable, under such circumstances, that the parties would have committed so gross an act of adultery in broad daylight, in the parlor occupied in common by two families, under the very eye of the mother-in-law, exposed to observation from without, with an open window into the green-house, liable to the prying curiosity or casual observation of servants, and in a situation where, if the parlor door was opened, escape from detection was impossible ? Would the physician have thus foolishly

hazarded his reputation? Would a young wife, who had been married but a few months, have thus madly hazarded reputation, character, independence, social position, and all that she had gained by her marriage?

Nor does the conduct of the mother-in-law appear to me consistent or reconcilable with her knowledge of the infidelity of her daughter-in-law. Her son was an only child, in whose welfare she must have felt the deepest interest. So long as the infidelity of his wife was a matter of doubt or suspicion, she would naturally have remained silent, and confined her suspicions to her own breast. But when she had been herself an eye witness of her guilt, when she knew with absolute certainty the unfaithfulness of the wife and the dishonor of her only son, it seems but natural that she should have made some effort to reclaim or restrain the wife, or at least to assure the son of the wrong he was suffering, that he might guard against its continuance. She disliked the daughter-in-law. She was opposed to her marriage to her son. She refused to be present at the wedding. She naturally preferred that her son should marry one of her own nation, of her own religious faith, and of his own sphere in life. He did neither. Regarding the daughter-in-law as an alien to her race, as a heretic in religion, and probably as a dishonor to her family, it was natural that the mother should entertain for her the most unfriendly feelings. She avows frankly that she disliked her at the time of her marriage, and that her dislike increased. There was obviously no sympathy or kindly feeling existing between them. The daughter-in-law was tolerated under the mother's roof for the son's sake, but it does not appear that she ever received from her a word of kindness or sympathy. There was no feeling of kindness to restrain the disclosure of the wife's infidelity. It is in evidence that the wife was treated by the mother-in-law with unkindness, if not with cruelty. She threatened, as she admits, for unguarded, perhaps disrespectful language on the part of the wife, to drive her from her house. She charged her in the hearing of her servants with theft, and yet she

admits that she never charged her with adultery, nor sought to turn her from her house on that account. It appears from the evidence that the mother-in-law, on the first of January, 1860, with full knowledge of the guilt of her son's wife—witnessed by herself in June—confirmed by what she saw in October, went to Georgia on a visit to her husband, leaving her son in possession of the house, and the wife in charge of the establishment, without a word of remonstrance to the wife, or of caution to her son, or even of information to her own husband. The son having removed to another residence during the absence of the mother in Georgia, and the wife having given birth to a second child in April, returned to the mother's house, with her consent and approbation, in September, where she remained until she abandoned him for alleged misconduct. Even after the wife had left her husband, the mother-in-law declared that her doors were open to the daughter-in-law if she chose to return. Now, that a mother, a woman of wealth and of respectable social position, should so have demeaned herself, seems to me in the highest degree unnatural and improbable. Her love for her son, her dislike for his wife, her regard for her own reputation and that of her family, would have prompted her to speak and to act. But for fifteen months not one word of friendly warning to the son, not one word of kindly remonstrance, or indignant rebuke, or angry condemnation to the daughter-in-law, escapes her lips. She quietly submits to have her house turned into a brothel, and to have a foul blot inflicted upon the honor and reputation of her family. It would be a reflection upon the witness to credit her statement that she saw what she now imagines, or says she saw, or believed what she now professes to believe. There is no evidence at the time of this transaction, or until the following year, of any intimacy between the wife and Dr. Titsworth. He testifies (and so is his account) that he visited the house twice in May, on the twenty-fifth and twenty-sixth, to vaccinate the child, and that he did not visit the house again professionally until September, and no witness has

been called to show that he was there. He says that he was in the house but once in the month of June, when he called to procure the scab from the arm of the child, and that he did not then see Mrs. Berckmans, but the servant only. Under these circumstances, I do not think the testimony of Mrs. Berckmans, uncorroborated and unsupported as it is, sufficient to establish the charge of adultery, against the full and explicit counter testimony of the defendant herself, and of Dr. Titsworth.

II. The direct evidence of guilt having failed, the complainant's case must rest upon the circumstantial evidence adduced in its support. It is clearly not necessary that the offence should be proved in time and place. The mind of the court must be satisfied that actual adultery has been committed, but if the circumstances establish the fact of general cohabitation it is enough, although the court may be unable to decide at what time the offence was committed. *Loveden* v. *Loveden*, 2 *Hagg. C. R.* 1; *Hamerton* v. *Hamerton*, 2 *Hagg. E. R.* 8; *Grant* v. *Grant*, 2 *Curties* 16; *Bishop on M. and D.*, § 422.

The first of the chain of circumstances relied upon in proof of the general cohabitation of the parties, is the length and frequency of the doctor's visits to her.

This evidence covers a period of about five months, from the last of March, or first of April, to the first of September, 1860, during the period that the complainant lived in his brother Prosper's house, on the opposite side of the road, and a short distance from his mother's. Five witnesses testify upon this point. One of these witnesses, John Simpson, speaks of Dr. Titsworth visiting the house frequently between the first of January and March. He thinks the complainant removed into the house on the first of January. In this he is clearly mistaken. The complainant did not remove into his brother's house until late in March, a few days before the return of his mother from Georgia. So she testifies, and so the evidence in the case clearly shows. After the first of

April, the witness knew of his making from five to ten visits of from half an hour to an hour's duration. Elizabeth Randall testifies to his making one visit of three hours duration in June. John Thys, who was in the complainant's employ as a laborer four or five days, but not consecutively, in June, testifies that every day he was there, the doctor visited at Mr. Berckmans between nine and twelve in the morning, while Mr. Berckmans was absent from home. Jacob V. Coles and Jane Gwynn also testify to frequent visits, sometimes four or five times a week, sometimes twice a day, sometimes an hour in length, and on one occasion over two hours.

The frequency and length of these visits, especially in the absence of the husband, without explanation, would certainly justify grave suspicions. But it is shown that Mrs. Berckmans was confined with her second child on the third of April, when her eldest was but little more than a year old, that after a partial recovery she suffered a relapse, and that she continued a long time in delicate health, having the care of two young children, without a professional nurse. It appears from the doctor's account book, which is produced in evidence, that he visited Mrs. Berckmans twice in March, previous to her confinement, that he delivered her of a child on the third of April, that during the month of April his professional visits were very frequent, and that they continued with greater or less frequency during the summer. None of his visits were made secretly or at unusual times. The only circumstance of suspicion is that they were long, and generally made during the husband's absence. It appears that the husband was absent daily at the seminary, from nine to twelve in the morning, and as some of the witnesses say, in the afternoon also. The visits were most frequently made in the morning during a portion of the day usually devoted to professional visits. It should therefore excite no remark, that it occurred during the absence of the husband from home. The professional visits of physicians to the families of men of business are probably, in a great majority of cases, m de when the father of the family is absent.

The second ground of suspicion is, that there were repeated interviews between the defendant and Dr. Titsworth at her mother's house in the evening, that she was once or twice at his office, and that he accompanied her home on several occasions, her husband not being present. This occurred between Saturday, the first of September, 1860, when the complainant and his wife removed from his brother's house to his mother's, and Wednesday, the nineteenth of September, when the wife left her husband. The evidence upon this point is furnished by the testimony of Dominic Canatta, an intimate friend of the husband, who as he alleges, for his own satisfaction, sometimes alone, and sometimes in company with the husband, was engaged *in watching* the movements of the wife. This surveillance of the wife was instituted by the witness in consequence of information derived from the husband. There is no room for doubt, that all the facts within the knowledge of the witness were communicated to the husband, and yet the friendly relations of the husband and the doctor continued until after the wife had left her husband. If the conduct of the wife in this regard was not entirely satisfactory to the husband, and if she was not fully justified by the reasons which she assigns for it, which I do not propose to examine in detail, it is at least apparent that there was nothing in her conduct which furnished to the husband, or which can furnish to the court, any satisfactory evidence of her guilt. Every fact stated by the witness, except so far as it is contradicted or satisfactorily explained by other evidence, is quite consistent with the purity and innocence of the wife.

The third ground of suspicion is, examinations of, and operations upon the person of the wife, with electro magnetism and with instruments, in September, October, and November, 1859. The details of these operations have been introduced into the evidence for the purpose of showing that they were unnecessarily gross; being indecent liberties with the person of the defendant, and indicative of sensual feelings and purposes on the part of the physician, and that it was in

fact, an attempt on the part of the defendant and the physi-
cian to procure an abortion.   That the physician and the
wife knew that she was pregnant.   That it was probably the
result of their illicit intercourse, and that they feared that
the appearance of the child might furnish some evidence of
its paternity.   The two theories seem quite inconsistent.   If
the defendant was pregnant by the physician, if there is the
least truth in the evidence of Mrs. Berckmans, that as early
as June, 1859, the defendant and her physician were in the
habit of adultery, it is scarcely credible that such extra-
ordinary expedients would have been resorted to for the
mere gratification of sensual feelings, or as a cover for in-
decent liberties.   Nor do I think the other theory at all
warranted by the evidence.   The fact is, that the evidence
upon this point was furnished by Dr. Titsworth himself.   The
nature of the operation appears by the charges upon his book
of account, for the recovery of which a suit had been instituted,
and a copy of the account filed with the justice.   That ac-
count was in the hands of counsel, before and at the exami-
nation of the witness.   These operations were all conducted
at the request of the husband, and in his presence.   This
fact is expressly sworn to by the physician.   If untrue, it
might readily and effectually have been contradicted by the
husband.   The account given by the physician is, that he
was first desired to ascertain whether the wife was pregnant,
and that fact being ascertained, he was desired to produce
an abortion.   For the purpose of satisfying the parties, he
used an instrument for the ostensible purpose of procuring
an abortion, but without any real intention of producing
that result.   Whatever difficulties may lie in the way of ac-
cepting this as the true version of the transaction, they ap-
pear to me to be far less than those which must be encountered
by adopting the theory of the complainant's counsel.   If the
doctor really wished to procure an abortion, why was it not
effected?   And if the wife consented, why was the husband's
concurrence at all necessary?   It may be added, that how-
ever immoral or unjustifiable the act may have been, the

desire of the husband and wife that an abortion should be procured, does not appear at all incredible. The wife had very recently given birth to a child, and had endured great suffering during her confinement.

But the most significant of all the circumstances relied on as evidence of the wife's guilt, is the participation by Dr. Titsworth in her flight from the husband's house, his visiting her in New York, and his continued intercourse with her after her return.

There is little or no dispute as to the facts in relation to this part of the case. The real question is, as to the nature and motives of the flight of the wife, and the object with which the assistance was rendered. Was it the flight of an adulteress through the complicity of her paramour? Or the flight of a virtuous wife from the real or fancied wrongs of the husband, and was the assistance rendered through the mere promptings of friendly sympathy? The evidence clearly shows that alienation subsisted between the husband and wife, from causes unconnected entirely with the wife's relations with Dr. Titsworth. Of the long continued existence of these difficulties, whatever may have been their origin, there is no question. Of the discordant relations between the wife and the mother-in-law we have already spoken. It is obvious that the wife was very reluctant to return to live under the roof of the mother-in-law. She did return on Saturday, the first of September. On Sunday Mrs. Marsh, the mother of the wife, visited the daughter at the house of Mrs. Berckmans, the mother-in-law. She was ordered to leave the house, and on her refusal to do so, the husband, with the aid of two men who had been procured for the purpose, attempted to remove her by force. The wife interfered for her mother's protection. A violent struggle ensued, in the course of which the wife and the mother both received injuries, and the mother was compelled to leave the house. On Monday, the wife communicated to the doctor her intention of leaving her husband, if she could take her children with her. On Tuesday she consulted counsel, and repeated

M *

her desire to leave her husband. On Wednesday she requested the doctor to speak to a magistrate and an officer to help her away with her children, complaining that she was unable to stay any longer in the house, and that she was afraid of her life. At her request the magistrate was spoken to, a carriage procured, and the following note written to the wife:

WEDNESDAY, 4 P. M.

Mrs. B. I have seen Esq. R., and he thinks the better way for you is to go unprepared, that is, without making any disturbance or exciting alarm, and upon more mature reflection, I think myself that will be best and certainly the easiest. For instance, let Rickey take Gussie riding in his wagon, and when you are all ready, with your hoops well laden with children's clothing, &c., then tell Rickey to draw him to the front gate, and Hennie with Nina, quietly but quickly * * * the hot-house, down the walk, and all at one move get into a carriage all ready, and * * at Bonnell, taking the first by-street to place of destination. N. B. Don't have the children dressed different from common daily dress; if you do it will foil you. Put on as many dresses and clothing as you can each, and attach the children's clothing to skirts. Be assured this is your best and safest course. I will see Dr. Sherman or Mrs. S., and have them drive up and stop at Bonnell, after the first train arrives this P. M.; and then if E. is down town, as he frequently is, avail yourself of the opportunity and slip, and don't delay too long about your things, but go with them if you can, but without them if you can't. A Friend. In the margin was written: I must see you to night, it may be the last opportunity in a long while; don't fail. Let no one read this, and burn it immediately.

In accordance with this arrangement, the wife left her husband's home on the nineteenth of September. The doctor saw her before leaving Plainfield, prescribed, and gave medicine for her children who were sick. The wife went to New York with her children and remained there ten days, then returned to the house of a friend near Plainfield, then to her mother's house where she continued at the commencement

of this suit. The doctor visited her twice in New York, as he testifies, at the request of the mother of the defendant, to see her sick children. He saw her again after her return, and continued to visit her up to the time of bringing the suit. The question is not whether the defendant left her husband for a justifiable cause, nor whether the doctor was justified in rendering the assistance he did. The simple inquiry is, whether the facts afford any evidence that the wife was guilty of adultery, and that the doctor was her paramour. I am clear that they furnish no evidence of adultery on the part of the wife, or of any guilty complicity on the part of Dr. Titsworth.

The arrangements for her departure, the consulting of counsel, the appeal to a magistrate, her manifest anxiety respecting her children, the general tone of the letter, are all I think utterly repugnant to the idea of the flight of an adulteress from the home of her husband, at the procurement or with the connivance of a paramour. The letter, the arrangements and circumstances of the transaction, afford convincing proof that the wife left the house of her husband, not as a criminal, but because she believed (whether right or wrong is immaterial) that she had justifiable cause for her departure. If it be conceded that the flight of the wife was without any justifiable cause, and the aid and counsel afforded by Dr. Titsworth an unwarrantable interference, it does not materially aid the complainant's case.

There are other facts in evidence, but they do not materially vary the aspect of the question. Evidence of a mother's errors or indiscretions can surely be no evidence of a daughter's guilt. Exposure to contagion is no proof of the existence of disease, though it may render its occurrence more probable. So exposure to moral contagion may render the existence of moral guilt more probable, but it will not justify the court in abating one jot of the evidence requisite to prove actual guilt. It is no province of an earthly tribunal to visit the iniquities of parents upon their children.

Nor is the conduct of Dr. Titsworth, as a witness before

the magistrate, competent evidence of the wife's guilt. It was competent only as it tended to affect the credibility of his testimony. Parol evidence of the declarations of a *particeps criminis*, even though he had confessed his guilt, would not have been competent evidence against the defendant.

The case in some of its aspects is not free from difficulty, and my mind has not been free from doubt during the progress of the investigation, but after the most anxious consideration I feel that those doubts can only be safely resolved in favor of the defendant's innocence.

To establish the existence of adultery, the circumstances must be such as would lead the guarded discretion of a reasonable and just man to that conclusion. It must not be a rash and intemperate judgment, moving upon appearances that are equally capable of two interpretations. 2 *Haggard C. R.* 2; 2 *Greenl. Ev.*, § 40; *Bishop on M. & D.*, § 423.

The facts proven must be such as cannot be reconciled with probability and the innocence of the parties. *Dailey* v. *Dailey, Wright's R.* 514.

Mere imprudence, indiscretion or folly, is not conclusive evidence of guilt. The mind of the court must be satisfied that there was an intimacy between the parties, entirely inconsistent with the duty which a virtuous wife owes to herself and to her husband.

Guided by these principles, I do not feel warranted in pronouncing the defendant guilty of adultery. While there is much in her conduct to regret and censure as indiscreet and ill advised, I do not find in the evidence satisfactory proof of guilt. Where the conduct of a party admits of two interpretations, equally consistent with probability, the one involving guilt and the other consistent with innocence, the rule of evidence as well as the dictates of justice, require that the interpretation should be favorable to innocence.

The burden of proof is upon the complainant, and it must be clear to justify the court in condemning a young wife to a life of dishonor, and her children to shame.

Every material circumstance relied on as presumptive evi-

dence of guilt, appears to me equally susceptible of an interpretation consistent with probability and with innocence.

There is force as well as justice in the suggestion of counsel, that while each circumstance standing alone may admit of explanation and fail to command our belief of the defendant's guilt, yet the case is to be decided upon a view of all the facts combined, and that when they are grouped and presented in one view, they lead irresistibly to the conviction of the defendant's guilt. I have re-read and considered the evidence in that aspect, with all the care which the importance of the case demands. And while it may be admitted that there are grounds for doubt as to the innocence of the defendant, there are controlling circumstances which preclude a conviction of guilt, to which I will briefly advert.

At the very threshold of the inquiry we meet the significant fact, that the bill filed by the complainant in this cause is virtually a defensive measure. The defendant left her husband's house with two infant children, the eldest eighteen months old, a poor and almost friendless woman, on the nineteenth of September, 1860, and found shelter under her mother's roof. Within two months she filed her petition for a divorce, on the ground of her husband's cruelty. She applied for alimony, and exhibited proofs in support of the application. It was not until February of the following year that the husband awoke to a sense of his wife's guilt and his own wrongs, and filed his bill for relief. All the material facts of the case were within his knowledge before the wife had commenced proceedings against him. His mother had told him that she had with her own eyes witnessed the adulterous intercourse. He knew of the wife's visits to her mother, and of the company in which she returned to his house on several evenings previous to her flight. He had himself traced her movements with the assistance of his Italian friend. He knew of the physician's visits, both in Plainfield and in New York, and yet he forbore to take a step for the vindication of his injured honor. In the investigation of a wife's guilt, the conduct of the husband is al-

ways regarded as a most significant circumstance, and one which cannot be lost sight of. So long as there is reasonable doubt of her guilt, or a plausible ground for a hope of her innocence, the husband's forbearance is both excusable and laudable. But when he holds in his hands what he claims to be satisfactory proofs of her guilt, his delay to prosecute is strong evidence in the wife's favor.

But the evidence furnished by the husband's conduct is not merely negative. There is, after the abandonment and return of the wife, the strongest direct evidence of his unshaken confidence in her virtue. It is proven that after the wife's return in October, when she went to his house to take away her things, that they had an interview, that he said he was sorry for what had happened, and that if she kept herself true to him they might live together after the affair was settled. True, this evidence comes from the lips of the wife, but it is not contradicted by the husband. It was a fact peculiarly within the knowledge of the parties themselves, and therefore, if untrue, eminently proper that he should have been called to contradict it. Is it possible that the husband who uttered that language could have believed his wife guilty? Does it not afford the strongest incidental proof of a fact which the evidence strongly favors, that the trouble between these parties has really been occasioned by the indiscretion and unwarranted interference of others?

Some of the evidence relied on as proof of criminal intercourse, points to a period of time when the wife was in the last stage of pregnancy; other portions of it to periods when she had just given birth to a child, during the period of her confinement or during severe illness, or the illness of her children, or when she was laboring under natural and severe mental anxiety; periods certainly when sensual indulgence would not be anticipated.

The evidence covers a period of four and a half years, extending from the marriage of the parties in February, 1858, down to the close of the testimony in 1862. It covers not only their entire married life, but the period of eighteen

months during the pendency of the suit and the taking of the the testimony. She has lived much of that time in the house, and under the eye of a mother-in-law who freely avows her suspicions and dislike of the defendant. She has been surrounded by servants. She has been watched by spies, and yet, exclusive of the two acts sworn to by the mother, and which have already been disposed of, there is evidence of no stolen interview; no private correspondence; no amorous or passionate utterance; no expression of affection; no licentious expression of lip or eye; no indecent familiarity; no personal freedom (aside from the performance of professional duties); no proximate act, leading up to the commission of the crime. I think it may be affirmed, however injudicious or indiscreet her conduct may be deemed, there is no one well authenticated act on the part of the defendant, inconsistent with the duty which a virtuous wife owes to herself and to her husband; no one which may not be reconciled with probability and with innocence. And yet the theory of the complainant is, that during months or years, the wife and her alleged paramour were pursuing a course of shameless adultery.

In order to prove adultery by circumstantial evidence, two points are to be ascertained and established; the opportunity for the crime, and the will to commit it. Where both are established, the court will infer the guilt. The radical difficulty with the complainant's evidence is, that while it establishes the one, it utterly fails to prove the other.

I cannot but think that the able and learned counsel of the complainant, in their conduct of the evidence and argument of the cause, felt the full pressure of this difficulty. Failing to prove a blemish in her reputation or a stain upon her virtue, they prove that her mother had been divorced, that the visits of her physician are too frequent and too long, and that, having no father, or brother, or friend, to whom she could have recourse, she resorted to that physician for counsel and guidance, when she was about to fly from her husband for his alleged cruelty.

. In view of the whole testimony, I feel constrained to say that I find no satisfactory evidence of the guilt of the defendant, and shall decree that the complainant's bill be dismissed.

NOTE. Decree unanimously affirmed by the Court of Appeals, at March Term, 1864.