This is a suit for separate maintenance with a counter-claim on the part of the husband for divorce on the ground of adultery. The parties were married on March 14th, 1926, in Brooklyn, New York. He is a Jew and she is a Christian. *Page 421 
In order to satisfy his scruples and, as he said, to prevent the opposition of his mother, they were married according to the rites of the Hebrew religion. They lived together until April 18th. From that time forward the husband made every effort to free himself from his matrimonial obligations. He never lived again with his wife. He sought an annulment in the New York courts, through his mother as guardian, alleging he was under age at the time of his marriage. He disregarded his statement at the time of his marriage that he was over age. He brought suits in the New York courts, and, when he feared they might be decided against him, as they eventually were, he came to New Jersey. His wife followed him and there began proceedings. Having insisted in the New York cases that he was a citizen of New Jersey, he averred in this case that he was a citizen of New York. He failed to obey the orders of this court until he was apprehended on a writ of ne exeat and threatened with jail. He filed in the New York court, during the pendency of the proceedings in this court, a false affidavit. For this he was brought before me in contempt proceedings, and admitted that he had perjured himself. He endeavored to strike a bargain, saying if I would not punish him for contempt for his untruthful statement (which was that I had made an order that in fact I had never made), he would obey the order of the court.
This is the character of the man who now, when he finds all his misrepresentations, subterfuges and untruthfulness swept away, has filed a counter-claim alleging that his wife committed adultery.
The fact of his desertion of his wife and non-support of her was admitted at the hearing. His counsel stated, as appears by the record, "we admit, if your honor does not believe our testimony [as to the adultery], that they have made out a case of unjustifiable non-support."
Let us then consider the charges as set forth in the evidence in support of the counter-claim. The husband is a musician and orchestra conductor in the theatrical world. His wife is an actress. *Page 422 
The first act of adultery is said to have occurred at the Seneca Hotel, Rochester, New York, on the 17th of February, 1927. The only witness to substantiate this is one Jack Horowitz, a friend of the husband's, who says he offered to help Schwartz get a divorce and appeared as a witness for that purpose.
He was a musician in the same company in which the defendant's wife appeared. His character, as appears from his own admissions, is on a par, perhaps lower, than that of his friend, the husband. His testimony is too vulgar to rehearse in detail. He says his habit is to "date up" and spend the night with any girl who appeals to him, while he is traveling with a show. His story says that on February 19th — the counter-claim alleges February 17th and no explanation is offered for the discrepancy — he was with the company, as was the complainant, at Rochester. He states that he asked complainant to meet him that night for the purpose, as he frankly admits, of having sexual intercourse, and that she consented. She, however, according to his story, did not keep the engagement. He, therefore, joined a card game next door to a room occupied by another man. There were four other players. He swears he saw complainant enter the room of the other man. He told three different stories as to how he happened to see the complainant. All seem highly improbable to me. For example — although he was engaged in a card game, he watched the door of the other room from twelve P.M. to four A.M. — saw her enter but did not see her leave. Then he says the room she entered was on a line with the one he was in, and that she approached from the other side, and did not pass by the open door of his room. When asked how he could see around a corner, he decided he had stepped into the hall and saw her as she entered. The other four card players have not been produced. The low character of this man, despicable I may say, the entire lack of corroboration, the hopeless inconsistency of the story, and his acknowledged bias in favor of his friend, the husband, convince me that there is absolutely no truth in his statements.
The second allegation of misconduct relates to an incident *Page 423 
which occurred in Chicago on June 17th, 1927. Complainant was appearing there with a theatrical company. She became acquainted with a man named Davis. She met him twice and dined with him. There is no allegation that on either of these occasions there was any wrong-doing. On the day in question, however, she was admittedly in an apartment with this man. Her story is that she went there at his request because he was to introduce her to his mother who would be able to procure for her a better professional engagement. She denies any improper conduct. The testimony against her is given by her mother-in-law, a paid detective and a man who volunteered his services the first time he ever met the mother-in-law. The whole history of the case discloses that the mother-in-law was bitterly hostile to complainant. According to her testimony, she went from New York to Chicago for her health. She was in search of baths, which were either in Chicago or somewhere in Michigan — just where she is uncertain. The defendant, however, expressly states that he sent his mother to Chicago to gather testimony against his wife. Within two hours after her arrival she met the witness Bloom, a total stranger, and arranged with him to follow her daughter-in-law, the complainant. They engaged a professional detective. The testimony of these three witnesses is contradictory and highly suspicious. For example, the witness Little, the paid detective, says that he observed the complainant and the alleged correspondent under the following circumstances: He went to an apartment house adjoining the one where complainant admits she was. He bribed the janitor to allow him to ascend to the third floor and enter a vacant apartment from which he observed complainant and a man in the other apartment house on the third floor. The uncontradicted testimony is that there was no apartment house next door, and that the building consists of a drug store in the first floor and a Chinese restaurant on the second floor. There is no third floor. Therefore, this whole testimony, in my opinion, is untrue.
It is unnecessary to consider the evidence any further. The prejudice of the mother-in-law and the evasions and contradictions *Page 424 
in her story are apparent. The witness Bloom is also contradictory. I cannot believe that a woman, who, as she says, went to Chicago for her health and then within a few hours of her arrival, engaged a total stranger to shadow her daughter-in-law at five dollars per day, is telling the truth. Neither do I believe the man Bloom.
The evidence in its entirety convinces me that these people concocted a deliberate plan to entice the complainant into a compromising situation from which adultery could be inferred.
It may be that complainant was indiscreet in going to an apartment with a man. But her story has a far truer ring than that of her accusers. I believe the man who urged her to meet his mother and promised her a better professional engagement was in league with the mother-in-law in the effort to entrap her.
The court of errors and appeals said in the case of Grundy v.Grundy, 92 N.J. Eq. 687 (at p. 688): "But as was said by Chancellor Green in the frequently quoted case of Berckmans v.Berckmans, 16 N.J. Eq. 122, 140, `mere imprudence, indiscretion or folly is not conclusive evidence of guilt. The mind of the court must be satisfied that there was an intimacy between the parties entirely inconsistent with the duty which a virtuous wife owes to herself and to her husband. The facts proven must be such as cannot be reconciled with the probability of the innocence of the parties. In order to prove adultery by circumstantial evidence, two points are to be established — the opportunity for the crime and the will to commit it. Unless both are established the court will not infer guilt.'"
As I have said, I do not believe the evidence as to the alleged adultery. I am convinced a plan was made to entrap this young woman in a compromising situation. Therefore, excluding this testimony, there is nothing to justify me in holding her guilty of the crime charged.
I will dismiss the counter-claim. As the desertion is admitted, the prayer for separate maintenance will be granted. I will fix the amount after hearing counsel. *Page 425