The respondent, Howard R. Stevens, filed a petition praying for absolute divorce, and alleged six acts of adultery by his wife with two persons named in the petition. Defendant in her answer denied the acts of adultery alleged in the petition and counter-claimed for separate maintenance and for the custody of their child, who was about two years of age when the case was tried, alleging that petitioner had wrongfully deserted her, had neglected to support her, and had wrongfully taken their child from her possession. Petitioner's answer to the counter-claim justified his desertion of defendant and his taking of their child on the ground of *Page 56 
defendant's adultery. Defendant, after final hearing, amended her answer by alleging condonation and connivance.
The petition alleged that the defendant committed adultery with one H. on December 21st, 1928; December 29th, 1928; January 3d 1929, and January 10th, 1929, and with one M. on May 24th, 1929, and May 25th, 1929.
The advisory master found the charges of adultery with H. on the 3d of January, 1929, and with M. on the 25th day of May, 1929, were sustained and a decree in favor of petitioner was entered. A careful examination of the proofs submitted leads us to the conclusion that this decree cannot be supported.
There was no direct evidence of adultery committed by the defendant with either of the alleged co-respondents. The circumstantial evidence was from the petitioner and three detectives hired by him to watch defendant and to secure evidence of misconduct.
The detectives were engaged in December, 1928, and continued their activities until May, 1929.
It was alleged that the act of adultery on January 3d 1929, was committed in an abandoned house at No. 539 West End avenue, in the city of Elizabeth. This house is back from the corner of Elmora and West End avenues. Petitioner and defendant lived at 516 West End avenue, the front porch of which house faced West End avenue. The vacant house was some distance from petitioner's home, and there were several houses between them. There was a path which led from Elmora avenue diagonally across the lot of the vacant house into West End avenue, on the side of the vacant house away from petitioner's house. This path was frequently used by petitioner and defendant, as well as by other persons.
Petitioner testified that on January 3d he was on his front porch and that he saw his wife alight at West End avenue from a bus driven by H. and enter the front of the vacant house. He further testified: "A few moments pass and the bus driver gets off and goes in the same direction. To satisfy myself I went down out of my flat, down the street. I walked around the old house. I did not see anything visible *Page 57 
on any side. Then I went back to my home and she came in at ten-thirty-three. It was ten-twelve when the bus pulled up."
A detective in petitioner's employ testified that at the same time he saw defendant alight from the bus at Pennington street, a block or more away from West End avenue, walk along a path that led past the house, and enter the rear of the vacant house. He further testified that he did not endeavor to ascertain if defendant and co-respondent had actually entered the house, and said he was not interested to learn if they were outside or inside. This witness could not see the front of the house from his position and the petitioner could not see the rear of the house from his position.
Another detective, a brother of the former witness, testified that the defendant alighted from the bus at Pennington street, walked into the path from the rear of the house, but he did not see her enter the house.
The father of the other two witnesses, and the detective engaged by petitioner to secure evidence of defendant's misconduct, testified that the defendant got out of the bus at West End avenue and went to the rear of the vacant house, and that the bus driver later went into the rear of this house. Neither of these last two witnesses was able to see if defendant entered the house and neither made any effort to find out.
Neither petitioner nor the detectives entered the house to see what was taking place therein. The petitioner did not see the detectives, nor did the detectives see petitioner. If any of these parties had been aware of the presence of defendant and her alleged paramour in this house under such circumstances, it is difficult to understand why they made no efforts to trap her.
It appears that the house had no windows or floors, although the lack of floors was not known by petitioner and his detectives until sometime after the alleged incident.
A significant and unexplainable fact about this occurrence is that the husband, although endeavoring to secure evidence of his wife's infidelity, made no mention of the incident to *Page 58 
his detectives, nor did the detectives, despite the petitioner's repeated demands for some evidence against his wife, deem the incident of sufficient importance to report it to the petitioner, and did not mention it until sometime in May, after the incident of May 25th.
The husband never mentioned the incident to his wife and continued to live with her for five months thereafter.
The chief detective testified that from his employment in December until May he made no report of any sort to petitioner or his attorney, although petitioner telephoned him several times a week and although he frequently saw the petitioner's attorney. When asked why he failed to report the matters concerning which he testified, he answered: "Why in these cases — I thought that Mrs. Stevens might see the error of her ways and change."
The testimony on behalf of petitioner is contradictory and wholly unsatisfactory to prove adultery. The witnesses do not agree upon essentials and contradict each other in important particulars. No one testified in such manner as to induce the belief that the defendant was, in fact, in the house on the occasion in question. It was specifically denied by the defendant and co-respondent, as was the commission of adultery on any occasion. It is difficult to believe that an aroused, injured husband, would see his wife enter a dark house and remain for twenty minutes with a man, of whose relations with his wife he was suspicious, without making some investigation to ascertain what they were doing, or to confront them in their misconduct.
The testimony as to the incident of May 25th is even less persuasive as to the guilt of the defendant.
It is alleged that on the night in question defendant committed adultery with one M. at Warinanco Park.
The testimony was in effect that the petitioner and one of his detectives saw defendant and the co-respondent enter the park, walk about one hundred and fifty yards and sit on a bench; that petitioner watched them for half an hour; that he was forty or fifty feet from them; that "she was in his arms;" and that "he could not see what was going on." *Page 59 
The detective testified that he was with Stevens but was two hundred and fifty feet away from where defendant was seated. He said they were embracing but he did not see any act of adultery.
Neither witness testified to any circumstance from which the conclusion that adultery was committed is warranted. Again we have the extraordinary circumstance of a husband and his detective testifying to a situation which they allege points to the commission of adultery, and yet they did not confront the delinquent wife and her paramour in the commission of the act. The irresistible inference is that nothing occurred on this occasion that served petitioner's purpose as evidence of his wife's wrong-doing.
Defendant denied that adultery was committed and says she knew her husband was following her on that occasion. She likewise denies the kisses and embraces.
The testimony shows that petitioner and defendant were not living hapilly as man and wife. Petitioner was, in the language of the master, "cold, indifferent, neglectful, morose, and of a totally different character from the defendant, she being optimistic, generous, full of life, and desirous of companionship and affection, which feelings were not reciprocated by the petitioner."
There is no proof to support a conclusion that defendant had any affection for either of the co-respondents. Her acquaintance with each of them was of short duration. The strongest proof is that with respect to the attitude of defendant toward M. on May 25th, and the proofs clearly show that adultery was not committed on this occasion.
That the defendant was shockingly indiscreet in what she did on both occasions referred to and upon other occasions is apparent. That her conduct was sufficient to arouse suspicion is beyond question. She was foolish, but it is not established that she was guilty of a crime. As was said by Chancellor Green in the case ofBerckmans v. Berckmans, 16 N.J. Eq. 122:
"Mere imprudence, indiscretion or folly is not conclusive evidence of guilt. The mind of the court must be satisfied *Page 60 
that there was an intimacy between the parties entirely inconsistent with the duty which a virtuous wife owes to herself and to her husband. * * * In order to prove adultery by circumstantial evidence, two points are to be ascertained and established; the opportunity for the crime and the will to commit it. Where both are established, the court will infer the guilt."
In the same case (17 N.J. Eq. 453) this court said:
"The charge made by the complainant, if true, is known to our law as a crime; consequently this prosecution partakes strongly of the nature of a criminal proceeding, so much so as to place the complainant under the necessity, not only of placing a decided preponderance of testimony in favor of the charge, but ofproving it to the satisfaction of this court, beyond a reasonable doubt."
Without further discussion of the vague, improbable, contradictory and unsatisfactory statements of petitioner and his witnesses, it is sufficient to say that the proofs fall far short of satisfying the mind of the court beyond a reasonable doubt that adultery was committed on either of the occasions found by the master, or on any of the dates alleged in petitioner's petition.
It follows that the refusal of maintenance and of the custody of their child on a finding of defendant's adultery is not sustained.
The decree of the court of chancery is therefore reversed.
For affirmance — CAMPBELL, CASE, HETFIELD, JJ. 3.
For reversal — THE CHIEF-JUSTICE, TRENCHARD, LLOYD, BODINE, DALY, DONGES, VAN BUSKIRK, McGLENNON, KAYS, DEAR, WELLS, JJ. 11. *Page 61