Charles B. Culver

*v.*

Anna I. Culver.

1. While the evidence of the accused parties in actions for divorce, grounded on adultery, is, as a general rule, entitled to but little weight, yet in a doubtful case it should be given sufficient weight to defeat a divorce.

2. No general rule, defining what circumstances will constitute sufficient evidence of adultery, can be laid down which will furnish a safe guide for every case, yet this much may be safely said: that the circumstances must be such as will lead the guarded discretion of a reasonable and just mind to a satisfactory conviction that the crime has been committed.

On final hearing on petition, answer and proofs taken before a master.

*Mr. Robert Adrian,* for petitioner.

*Mr. Edward W. Strong,* for defendant.

Van Fleet, V. C.

The petitioner seeks a divorce from his wife on the ground of adultery. Adultery with three different men is charged, but no attempt has been made to prove the fact except with two of them. The evidence is both direct and circumstantial, and, if believed, fully establishes both charges. But the most material and decisive part of that which support one of the charges proceeds

from a source so impure and untrustworthy that I am unable to say I believe it, or that the charge is proved by a sufficient weight of evidence to entitle the petitioner to a decree. Besides, both the defendant and her alleged paramour positively deny the truth of the charge, and although the evidence of the accused parties in such cases is generally regarded as of little force, especially when the criminating evidence is convincing, yet in a case of doubt their denial is sufficient to defeat a divorce. The evidence, however, in support of the other charge comes from much more credible sources, and is much greater in volume and strength. It has produced the conviction in my mind that the defendant is guilty, but I think I ought also to say that this result has not been reached without hesitation and misgivings.

If the defendant's story is true, her married life has been one of wretchedness. She represents her husband as jealous, passionate, unjust and brutal, and describes her married life as a prolonged misery in consequence of his revolting accusations and the scorn and neglect with which he generally treated her. If her story is true, it is quite certain if she ever loved him, he had, by his harsh and contumelious treatment, completely alienated her affections, and deprived the purity of his bed of the safeguard of her love. She had nothing to restrain her from crime but her love of purity and self-respect. Her story, in the main, making such allowance for exaggeration as a person testifying under a deep sense of wrong would be likely to make, must be accepted as true, for the petitioner has neither denied nor explained by his own oath a single one of the violations of conjugal duty she charges against him. The petitioner must, therefore, be considered as standing before the court very much in the condition described by Chancellor Zabriskie, in *Derby* v. *Derby, 6 C. E. Gr. 36.* His hands are not so unclean that he should not be allowed to touch the horns of the altar of justice, but they are so weakened, blanched and attenuated that they take but a feeble hold of them.

The charge which I think is proved is the one which accuses the defendant with criminal intimacy with a person by the name of Worthington. In support of this charge, the testimony of an

Culver *v.* Culver.

eye-witness is produced. He swears he saw them in the act. But his testimony is somewhat contradictory in a material part, and if it constituted the only proof in support of the charge, I think it would be impossible to say that the fact of adultery was sufficiently proved to warrant a decree of divorce. But this is not the only proof in the case. There is evidence of such proximate conduct by the parties as to render it easy to believe that they behaved as this witness says they did. Adultery is always clandestine; it is generally committed in secret, and it rarely happens that direct proof of the fact can be obtained, but it is also true that parties living in adultery almost always, by their conduct towards each other, so plainly indicate their true relations as to furnish highly satisfactory evidence of their crime. It is impossible to define, by any general rule, what circumstances will constitute sufficient evidence in each particular case, but it may be said, generally, that the circumstances must be such as will lead the guarded discretion of a reasonable and just mind to the conviction that the crime has been committed. Where a guilty love is shown to exist, as where the parties manifest an unwarrantable affection for each other and seek frequent opportunities to be together alone, and when surprised in their seclusion appear confused and disturbed, it may be safely concluded, in the majority of cases, that they have the will to commit the crime; and if it be shown, in addition, that they have been together under such circumstances as afforded them an opportunity of having sexual intercourse without danger of detection, the proof of their guilt may be considered complete.

During the period it is said criminal relations existed between the defendant and Worthington, the petitioner kept a country inn in the county of Middlesex, and also cultivated a farm lying near his inn. The defendant waited on customers at the bar in the absence of her husband. Worthington was a frequent visitor at the inn. A brother of the defendant, who lived in the petitioner's family, says he came there two or three times a week, generally in the afternoon. He was there frequently in the petitioner's absence. The frequency of his visits and the character of his attentions to the defendant attracted attention as early as

Culver *v.* Culver.

1875, and caused considerable gossip among the defendant's neighbors. Conduct strongly indicating a guilty attachment, such as kissing, embracing and sitting in close proximity, is proved. On one occasion, in August, 1876, it is proved by two witnesses that the defendant, after waiting on Worthington and these two persons, left the bar-room, and that Worthington went out immediately after her and remained away for some time. The conduct of the parties created so much suspicion in the mind of one of these persons that, on leaving the inn, he says he said to Worthington that he thought he did wrong, in view of the rumors that were in circulation, in following the defendant out of the bar-room. We are not informed what Worthington said in reply. In the fall of the same year two political meetings were held on the same evening, at different points near the inn, one by Democrats and the other by Republicans. Worthington says that he was a strong Republican and the petitioner a Democrat, and that one of the reasons which led him to go so often to the petitioner's inn was that the inn was quite a centre of democracy. The petitioner attended the meeting of his party. Before he left, Worthington said he was going to the Republican meeting, but he did not go. He left the inn and started in the direction of the meeting, but retraced his steps before getting out of sight of the inn and came back, and remained at the inn with the defendant until after eleven o'clock, and until after the petitioner returned home. Worthington, according to his own description of himself, was a zealous and active partisan. He had represented his party in the lower branch of the legislature. The canvass then in progress was for the election of a president of the United States, and unless there was some specially powerful attraction at the inn, it is difficult to understand why he should have remained there that night in preference to attending a meeting of his political associates. The excuse given for his return to the inn is, that after starting to go to the meeting he met some friends a short distance from the inn and returned with them; but the proof is that he returned alone and found three friends at the inn, who, after drinking with him, left about nine o'clock, leaving him and the defendant alone. The defendant

Culver *v.* Culver.

and Worthington were the only persons. in the inn that night, except two servants, from nine o'clock until eleven. It is impossible for me to understand Worthington's conduct on this occasion, especially in view of the fact that he knew that his relations with the defendant were the subject of neighborhood criticism, except on the theory that he had conceived a lascivious passion for her.

The parties separated on the 3d of July, 1877. Worthington had spent the afternoon of the previous day with the defendant while her husband was absent in the harvest-field. During the night of that day the petitioner accused the defendant, with great violence of language, with having committed adultery with Worthington. She says he told her if he gave her her deserts he would shoot her on the spot. Worthington says, three or four days after the separation, he heard that the petitioner had turned his wife out of his house in consequence of her relations with him ; that he was very sorry she should suffer distress on his account, and he made up his mind he would see the petitioner at once. He went to see him that day. He says the petitioner treated him with perfect good nature, but he does not pretend that he asked the petitioner whether he had sent his wife away because he suspected that she had been criminally intimate with him, or that he uttered a single word in exculpation of the defendant, or of remonstrance against the injustice of the petitioner's conduct. He says the occurrences that day were so perfectly ephemeral that they did not make enough impression upon his memory to enable him to remember the date. The defendant, soon after leaving her husband, went to her father's house. Worthington visited her there. His visits were frequent, and generally at night. A person living just across the street from her residence, and who seems to be neither an eager nor a partial witness, swears that he has seen Worthington go to her residence a great many times at night, from nine to ten o'clock and half-past ten, and that he has seen him leave there as late as eleven o'clock on several occasions ; and that the defendant generally received him at the door when he entered and accompanied him to the door when he left. This witness further says that on one

occasion, in November, 1877, he happened to be on the street one evening, on his way home, when Worthington was on his way to the defendant's residence ; that he was immediately behind Worthington and saw him walk to the front door of the defendant's residence, open it and walk in and close the door behind him. There is no evidence in the case which, in my estimation, in the slightest degree impugns the credibility of this witness or mitigates the force of his evidence. It is also proved, in such manner that I think the evidence must be believed, that Worthington met the defendant in May, 1882, on her arrival in the city of New York, and kissed her, and that they afterwards went together to a hotel. An attempt was made to show that this hotel was a bed-house or house of assignation, but the proof offered to establish that fact is clearly inadmissible and without the least particle of probative force.

The effect of these circumstances, when combined with the direct proof, is to convince me that the defendant is guilty. Neither class of proofs, standing alone, would perhaps be sufficient to produce that result, but when considered together my conviction of the defendant's guilt is so strong that, although I fear the petitioner has shamefully disregarded many of his conjugal duties, I cannot, without disregarding his legal rights and endangering the sanctity of the marriage bed, refuse a divorce. A decree of divorce will be advised.