## Leopold Ernst Herman Hurtzig

*v.*

## Emma Flora Hurtzig.

1. It is not requisite to a decree for divorce that there shall be direct proof of adultery.

2. The burden of proof is upon him who asserts the adultery.

3. To establish adultery by inference, the circumstances from which the inference is drawn must be such as would lead the guarded discretion of a reasonable and just man to the conclusion of guilt.

4. If the circumstances in proof, taken singly and together, admit of two interpretations, that which favors innocence should be adopted.

---

On final hearing on petition, answer and proofs.

*Mr. John C. Besson,* for the petitioner.

*Mr. William S. Stuhr,* for the defendant.

The Chancellor.

The petition is filed by the husband against the wife for divorce, upon the ground of adultery.   There is no direct evidence of the fact of adultery, but it is claimed that the circumstances proved sustain the charge.   It is not requisite that there shall be direct proof of this crime, for if that were the rule, there is not one case in a hundred where such proof would be attainable.   The

crime is almost invariably clandestine, and committed only when every precaution is taken to preclude the possibility of its discovery. Familiar *indicia* of it are : loss of affection that is due to, and was bestowed upon, its legitimate object, and the bestowal of affection upon an unlawful object ; stolen interviews ; private correspondence ; amorous and passionate utterance ; personal freedom ; indecent familiarity ; compromising situations, and the like. There may also be slight, delicate and indefinable circumstances, proximate to the adultery and peculiar to a given case, that, though less prominent as *indicia,* are, nevertheless, powerful factors in producing conviction of guilt.

It is often difficult to discriminate between that which points to the crime of adultery and that which indicates nothing more than imprudence, indiscretion and folly. It must be borne in mind that the burden of proof is upon him who asserts the adultery, and that that burden must be clearly sustained.

It has been held that where it is established that the defendant and her *particeps criminis* had the will and the opportunity to commit the crime, the court will infer guilt. *Berckmans* v. *Berckmans, 1 C. E. Gr. 122, 143 ; Black* v. *Black, 3 Stew. Eq. 228, 230 ; 2 Bishop Mar. and Div. § 619.*

The main difficulty in the application of this rule is in the determination, from circumstances, of the condition of the minds of the defendant and her *particeps criminis.* This suggestion shows the necessity, in such determination, of the application of the precautionary test, that to establish adultery the circumstances must be such as to lead the guarded discretion of a reasonable and just man to the conclusion of guilt. The judgment must not be rash and intemperate, moving upon appearances that are equally capable of two interpretations. *Loveden* v. *Loveden, 2 Hagg. Con. R. 1 ; Day* v. *Day, 3 Gr. Ch. 444 ; Berckmans* v. *Berckmans, 1 C. E. Gr. 122, 140 ; Culver* v. *Culver, 11 Stew. Eq. 163.* If the circumstances, taken both singly and together, reasonably admit of two interpretations, that interpretation which favors innocence should be adopted. A careful examination of the evidence, in this case, satisfies me that the following facts are established :

The petitioner and the defendant were married in Jersey City in October, 1876, and thereafter took up their residence in the city of Hoboken. They have had five children ; three of whom are now living ; Ernst, who was born in April, 1880 ; Ida, who was born in October, 1881, and Elsie, who was born in October, 1882.

The petitioner is a dealer in lumber, and, during the period in which it is alleged the adultery was committed, was frequently absent from home for weeks and months at a time, and when not at a distance, was, during that period, usually occupied at his place of business, in New York city, from early morning until late in the evening.

George Biese, who is alleged to be the defendant's paramour, is a music teacher, married, and a resident of Hoboken. The petitioner and the defendant formed his acquaintance at a singing society of which he was the leader and to which they all three belonged. Biese and his wife, afterwards, became the friends, and frequently the guests, of Mr. and Mrs. Hurtzig. In 1886, the petitioner engaged Biese to give Mrs. Hurtzig lessons in music, and shortly after the commencement of those lessons the train of circumstances we have to consider began.

Not long after the commencement of the lessons an intimacy sprang up between the teacher and pupil. He at first joined her in her daily walks alone, or with her children, and, later, returned with her to her home and partook of her hospitalities. It soon became evident that he had gained her esteem and then her affections. Their meetings became more and more frequent, and soon attracted so much attention that the tongue of scandal was set in motion. In this posture of affairs the petitioner returned from a visit to the South, and was apprised of the comments that were being made upon the conduct of his wife and Biese. He remonstrated with them, without avail. His suggestion to his wife, that her good name would suffer from the prolongation of the intimacy, only irritated her to anger. She seems to be of a stronger and more determined character than her husband, and, although she assured him that her intimacy with Biese was innocent, she refused to terminate it. The effect of his interference

was merely to inaugurate a course of secrecy and duplicity that resulted in binding the suspected persons more intimately together. The walks and visits thereafter became more frequent .and prolonged.

On the 30th of July, 1886, the defendant and Biese made a false excuse to the Hurtzig servants, and left the house quite early in the morning, and remained away until after nine o'clock .at night. When they returned, they were met at the door by the petitioner, who had unexpectedly come home from the South. To him they reiterated the falsehood they had told the servants, that they had visited a friend, a Mrs. Mischke, at Union Hill, .three miles away. Early the next morning the defendant visited Mrs. Mischke, and begged her to support them in their deceit. Although pressed to explain their whereabouts and conduct on that day, both Biese and the defendant fail to do so. They claim forgetfulness, but the vividness of their recollection of the unexpected meeting with the petitioner upon their return, satisfies me that this claim is but a shallow pretence. The evidence shows that Biese visited the defendant at her home not only in the daytime but also at night, and remained with her alone for hours at a time, and that upon several occasions he made long visits to New York city with her. On the 9th of April, 1887, he was in her house from nine o'clock in the morning until nearly five o'clock in the afternoon, and on the 14th of the same month his visit extended from half-past eleven A. M. to half-past four P. M. On the 8th of the next month he walked with her in the afternoon, and, returning home with her, remained in her house until after two o'clock the next morning. On each of these times the petitioner was away from home. These are, perhaps, the most pronounced of the scores of occasions when the defendant and Biese are proved to have been together. No excuse, that accords with decency or propriety, is given for such visits. The servants of the Hurtzig household are mainly relied upon to explain how the time of such visits to the Hurtzig house was occupied. From their testimony, corroborated by admissions of the defendant and evidence given by Biese, I am satisfied that it was spent in eating and drinking and in long private interviews.

Biese speaks of his favorite dish being prepared for him on several occasions, and the servants mention the fact that at times eight and ten bottles of beer would be drunk during a single visit. It is also in evidence that, at the visits, wine as well as beer would be consumed in large quantities, and that the defendant and Biese used to drink alone, together. The private interviews were usually in the reception room. The doors of this room would be kept closed, and at night the lights would be turned down. The interviews would last for hours, and the defendant frequently came from them with her hair in disorder.

While visiting in this way Biese did not hesitate to use the water-closets of the house, at first, one in the basement, and after a time one adjoining the bedroom of Mrs. Hurtzig, to which he obtained access by passing through that bedroom. It is shown that the eating and drinking were not confined to the visits to the defendant at her home, but that during their walks the defendant and Biese would often stop at saloons and hotels, and eat and drink together.

Upon one occasion Fritz Hurtzig, a nephew of the petitioner, was sent from the petitioner's place of business to the defendant with money for household purposes. He reached his uncle's house between two and three o'clock in the afternoon, and found Biese and the defendant together in the reception room. When he entered, Biese had evidently been drinking and was somewhat intoxicated. After a short time he asked the defendant to bring some wine, and she promptly brought it, and subsequently renewed the supply. The two men then drank the wine, and Biese commenced to laud the defendant, saying that she was an amiable, lovely woman; that he loved her; that it was a pity that he was married; that he would like to marry a woman like the defendant. Mrs. Hurtzig was present when this was said, and failed, in any way, to signify her disapproval of the conversation. Late in the fall of 1886, the petitioner's suspicions became so aroused that he terminated the music lessons, ceased to cohabit with the defendant, and caused Biese and her to be watched. The men who were employed for that purpose testify that the defendant and Biese continued their walks together,.

sometimes alone and sometimes in company with the defendant's three children.   They say that the couple would walk together, arm in arm, and that at times, in lonely places, Biese would embrace and kiss the defendant.   The defendant and Biese deny that the testimony, as to the embracing and kissing, is true, and it is urged, because the watchers were employed and paid by the petitioner, that their testimony should be rejected.   I do not think that their testimony should be unceremoniously thrown out, but I have no hesitation in saying that it should be subjected to close scrutiny and received with great caution.

The employment itself is an incentive to an unscrupulous witness to shade his testimony to his employer's purpose, and must, in some degree, influence the preceptive powers of one who intends to be honest.   The credit to be given must depend upon the character and surroundings of each witness, and the extent to which he is corroborated, either by the testimony of others, or by circumstances, or by the inherent probability of the truth of his story.   Three witnesses of this class were employed, two of them were citizens of Hoboken and the other was a professional divorce detective imported from New York.   One of the Hoboken men was a chanceman of the police force, and the other was engaged in real estate and insurance business.   The testimony in question came from the two citizens of Hoboken.   Neither the defendant nor Biese denies that they were together at the places where these witnesses say they saw the acts of familiarity.   They simply content themselves with a denial of those acts.   Nothing is urged against the character of either of these witnesses, except their employment in this case as spies.   I find other witnesses in the case speaking of acts of similar character, and feel that I cannot refuse all credit to these men.

Mrs. Mischke, to whom reference has been made, was visited several times by Biese and the defendant.   She says that she did not see them kiss each other, but they acted as if they were the greatest friends.   She says that they would walk together, arm in arm, and that as they walked the defendant would talk to Biese, and look up into his eyes " as if she were his bride." Meta Seedorf, one of the servants in the Hurtzig house, states

Hurtzig *v.* Hurtzig.

that upon one occasion, as she was on the stairway, she looked through the transom over the door of the reception room and saw Biese sitting with his arm about the defendant's waist. The same servant mentions another occasion when she saw the defendant playfully jump down several steps into Biese's arms, where she was held for several seconds. Also that at another time, when the children were playing leap-frog, the defendant asked Biese to vault over her back, which he refused to do for fear he might hurt her. At another time, she saw Biese slap the defendant playfully on the bustle as she walked past him in the reception room.

On the 3d day of May, 1887, the petitioner came home and found Biese with the defendant in the reception room. As he was about to enter he saw the defendant running excitedly about the room, but when he entered she stood near the table, apparently examining some photographs, while Biese stood at the other side of the table. An empty beer bottle was on the table. He at once ordered Biese to leave the house, and, upon his hesitating and commencing to speak, called him „ein Lump" [tramp], and threatened to call an officer to put him out. The defendant then told the petitioner that it was an insult to her to call Biese „ein Lump," and the petitioner told her that she could also go, that he could not imagine how she could throw herself and family away upon that man. She replied that the petitioner's stupid face could not compare with Biese's intelligent features. He said that it was fortunate that Biese got out without further trouble, and she again replied : " What is the matter with you, you are only a dwarf in comparison with him." That night the petitioner went to Kentucky, and the next day Biese and the defendant met again and were daily thereafter together. On the 8th of May, they walked with the little children in a rain-storm for several miles, the children under one umbrella, and they under another. They returned home after eight o'clock at night, and Biese remained until after midnight.

The proofs show that upon two occasions the defendant purchased a nerve tonic in New York for Biese, and that on one occasion, when he complained of a headache, she bathed his

head. On July 8th, 1887, she wrote a letter to one Otto Krote, who had been a pupil of Biese, in which she stated that the friendship that had grown up between her and Biese had been strengthened by the persecution of her husband and Mrs. Biese; that she was greatly concerned about the health of Biese, and feared that he would be drugged by his wife, and she therefore begged Krote to look after him with energy, and to call a physician if he saw anything amiss. She assured him that she would refund any moneys that he might thus expend. She also desired that he would report to her as to Biese's condition, and remember her to Biese. She concluded by requesting him to destroy her letter. Krote spoke to Biese about the letter, and Biese also requested him to destroy it.

On the 9th of August, 1887, the petitioner and the defendant got into an altercation, in which the petitioner accused his wife of being a "bad woman." When he made the accusation his back was turned to her and she kicked him, and, upon his facing her, she kicked him again, that time below the stomach and in such a way as to cause him so much pain that he bent in his agony. As she continued her attack, he caught her and threw her on the bed ; there she continued to fight and beat him, and scratched him in the face, so that, releasing himself, he ran out of the room and downstairs, calling upon the servants. Immediately after this trouble the defendant went out, and within a few minutes was with Biese in the fields above Hoboken. As they walked together they were followed by the men who had been employed to watch them, and also by the petitioner and a friend. A photographer was secured, and as they sat together talking, a photograph of their position was secured. She was then seen putting her arms around Biese's neck, and it was observed that Biese tapped her below the stomach with a newspaper he had doubled in his hand. The defendant and Biese explain this scene by stating that she put her arm about Biese's neck to illustrate how her husband held her, and that Biese laughingly tapped her below the stomach and said, "How would you like some one to kick you there ?"

The divorce detective was employed in December, 1886, and

Hurtzig v. Hurtzig.

then ingratiated himself with Biese by becoming his pupil. His design, of course, was to gain Biese's confidence and procure evidence of his true relation with Mrs. Hurtzig. According to his account, he was successful in his undertaking and secured admissions from Biese, which, if his testimony were believed, and the admissions of a *particeps criminis*, not made in the presence of the defendant, were admissible in evidence (*2 Bishop on Mar. & Div.* § *618*, and *Berckmans* v. *Berckmans, 1 C. E. Gr. 122, 140*), would go far to criminate the defendant.

I think it is credibly established that he became to Biese an unprincipled libertine, and as such sought an introduction to Mrs. Hurtzig. Biese resisted his importunity, and did not give the desired introduction until the detective met him and the defendant, face to face, in such a way that compliance with the request could not be avoided. Biese then introduced the defendant as Madame Schultze, and the defendant assumed that name, but refused the detective's invitation to drink and drive with Biese and himself. The defendant was not asked why she assumed the name without objection. Biese says that he did not see fit to introduce the detective to a "fine lady."

When the citation in this suit was served upon the defendant she immediately sought Biese, and with him consulted her counsel and arranged for her defence. The petitioner offered in evidence several of the defendant's letters to him which immediately antedate the intimacy with Biese, and abound in expressions of sincere affection for him. The purpose of the offer is that those expressions may be contrasted with the evidence as to the defendant's feelings towards the petitioner after the commencement of the intimacy with Biese, and thus emphasize the estrangement of her love. Other letters from the defendant show the progress of her entanglement with Biese and her estrangement from her husband.

The circumstances referred to, prove that the defendant lost her affection for her husband and bestowed it upon Biese. Her condemnation of her husband, her treatment of him, her disregard of his advice and wishes, and the vicious comparison of him with Biese, satisfy me of the former, while her conduct and con-

22

fidences with Biese, her desire to be in his company and her solicitude for his welfare, convince me of the latter.  The proofs also show other *indicia* of the crime in question, stolen, frequent and continuous interviews and personal familiarity.  Nothing in the case is more decidedly indicative of the character of the intimacy that existed, than the interview between the defendant and Biese, that immediately succeeded the difficulty between the husband and wife in August, 1887, at which she confided to him the particulars of a disgraceful altercation with her husband, touching her loyalty as a wife, brought about by her intimacy with the very man in whom she then confided, and at which, with indecent liberty, he tapped her with his newspaper and asked, " How would you like some one to kick you there?" This man kissed and embraced her, and declared that he loved her and would like to marry her, and she made no remonstrance, but, on the contrary, thereafter sought his companionship, against the earnest protest of her husband and friends; hung upon his arm; looked lovingly in his eyes, and had long and private interviews with him, by day and by night, from which she came with her hair in disorder.  With this man she compares her husband, in such a manner as to exhibit admiration for the former and hatred of the latter.  I cannot escape the conviction, that desire and the opportunity to gratify it, are abundantly proved, and I fail to conceive that a married woman would go thus far, in disregard of all duties and decency, without a complete surrender of her virtue.  After weighing each circumstance in proof separately, and then all the proofs together, I am constrained to reach the conclusion that the defendant has been guilty of the crime charged, and that the prayer of the petition should be granted.