The parties were married in 1919 and have lived in this state nearly all of their married life and more than the statute requires. They have one daughter, now about six years of age. Their lives appear to have run smoothly until the spring of the year 1924.
In August of 1923, a man named Siegred Olsan, a friend of the petitioner, came to board with the parties, apparently, at the suggestion of the petitioner. During the following winter or early spring the petitioner says that he began to grow suspicious of his wife and Olsan because of her attentions to his personal comforts around the house and some whisperings that he overheard between them, the substance of which he did not give. In this he is not corroborated. Shortly afterwards his wife refused him the marital rights, and, eventually, confessed to him that all love for him had *Page 191 
been dissipated. June 9th, 1924, his wife, without cause, left his home and did not return until the first or second week of the following month. She did, however, on July 1st, intervening, appear against him in the juvenile court for support. At that time strong efforts were made by the attorneys representing the parties to have her return to her husband. This she refused to do, but did return to him, as just mentioned, at a later date.
The only testimony offered to support any act of adultery alleged in the petition was in the attempt to prove the commission of the offense on July 23d 1924. On the preceding day she sought her husband's permission to go out for the evening, whereupon he put her off with some excuse until his return from his work, and, in the meantime, communicated with a private detective and arranged to have her followed. That night she left the home and met Olsan, with whom she proceeded to New York City, where they boarded a passenger boat plying between New York and Atlantic Highlands. The operative who had followed them then returned to the home of the petitioner in Jersey City and acquainted him with what had been observed. The husband and his agent then proceeded to New York to await the arrival of the boat upon its return trip. At about eleven-thirty that night the boat landed, and the defendant and her companion left it arm in arm. They then returned to Jersey City, where they stopped at a Chinese restaurant, apparently for the purpose of securing something to eat.
The petitioner and the detective proceeded in an automobile operated by the latter and took up a position in the vehicle, from which they could watch any approach, not only to the home of the defendant, but to the house in which the alleged particepscriminis had secured a room, he having left the home of the parties when the defendant went away from her husband in the previous month. At about five minutes after one, on the morning of the 23d of July, the defendant and Olsan were observed to come by a circuitous route to the house in which the latter lived, and enter the front doorway. Thereupon the petitioner went to *Page 192 
a telephone to inform the operative's employer, while the operative maintained a watch upon the doorway. Upon the arrival of the principal detective, he, the petitioner, and a police officer patroling that vicinity, entered the doorway through which their quarry had gone. There is some discrepancy in the testimony as to the layout of the vestibule of this entrance, but not of a nature to discredit the testimony of the petitioner and his witnesses. When they gained entrance they discovered the defendant and her companion in the hallway, which was dimly illuminated, standing face to face and drawing back somewhat from each other. No conversation of any importance ensued, and the police officer arrested the defendant and Olsan and conveyed them to the nearest police station, where they were interrogated, and, finally, released, after Olsan had convinced the authorities that his home was in the building where he had been found, and that he and the defendant had not been lurking there for the purpose of burglary or thievery.
This completed the petitioner's proofs. There was no evidence of any expressions of illicit affections, no holding of hands, no embraces, no kisses, no improper or indecent personal conduct, and no love letters at any time during the acquaintance of this man and woman. When they were found in the hallway their persons were not in contact, the one with the other, no articles of clothing were disarranged — in fact, even the woman's hair and hat were not disturbed. The utmost that the paid operative could say against their conduct was that they walked arm in arm and were laughing and talking with great apparent animation and amusement coming to and return from the boat.
Of course, this case falls into the category of those where the petitioner relies upon circumstantial evidence to prove his charge. In this he has failed. The opportunity to commit adultery on the morning of the 23d of July was ample, the defendant and Olsan having been alone in the hallway for a period of twenty or twenty-five minutes; but the proofs are utterly lacking to convince any reasonable and impartial man of any criminal desire. That the woman was shockingly *Page 193 
indiscreet in entering the hallway of the boarding-house on a night in the middle of summer, when she could not even advance the excuse of inclemency of weather, is apparent. That her conduct was enough to arouse suspicion in the bosom of any husband is equally certain. But indiscretion is not punishable, and courts of justice do not act upon suspicion. For what purpose she entered this building I do not know, but it is certainly not proved that she accomplished her purpose if that purpose was to commit adultery.
From the time of the establishment of this court its members and the members of the court of errors and appeals have said and reiterated that adultery is a serious charge, to be proved only by strong, clear and cogent evidence. In Day v. Day, 4 N.J. Eq. 444,
the chancellor quotes from the opinion of Lord Stowell in Williams v. Williams, 1 Hagg. Cons. 299:
"The only general rule to be laid down is, that the circumstances must be such as to lead the guarded discretion of a reasonable and just man to the conclusion, for it is not to lead a rash, intemperate judgment, moving upon appearances, that are equally capable of two interpretations."
To the same effect is Berckmans v. Berckmans, 16 N.J. Eq. 122; affirmed, 17 N.J. Eq. 453. The court of errors and appeals there laid down the rule to be that a charge of adultery in a suit for divorce "partakes strongly of the nature of a criminal proceeding" and must be proved "beyond a reasonable doubt." These opinions have been followed in innumerable cases, as late asMarchese v. Marchese, 98 N.J. Eq. 379. Reid v. Reid, 17 N.J. Eq. 101,
is the same way. Vice-Chancellor Van Fleet reiterated the rule in Culver v. Culver, 38 N.J. Eq. 163. To the same effect are Hurtzig v. Hurtzig, 44 N.J. Eq. 329; affirmed,45 N.J. Eq. 869; Osborne v. Osborne, 44 N.J. Eq. 257, reversing the decree of this court. There are many other applications of this rule.
It is unquestionably true that the defendant has been guilty of gross indiscretion, which might be otherwise interpreted if she was a woman of education and great refinement *Page 194 
(Poynt. M. D.), but the utmost proved against her is, that while she was estranged from her husband she clandestinely met her alleged paramour and went with him upon an innocent journey to while away a summer evening and enjoy a brief trip upon a passenger steamer, which the proofs disclose contained no sleeping apartments or other private rooms within which adultery might have taken place, and that upon her return she most indelicately entered the common hallway of the boarding-house in which her companion had taken up his residence. These facts are certainly insufficient to convict her of the matrimonial offense of adultery in the early hours of July 23d 1924 — the only act of adultery upon which proof has been submitted. This woman must be assumed to have been virtuous up to this time. Courts will not suppose that a hitherto chaste woman suddenly turns adulteress in the absence of strong proof. In the case of Alexander v.Alexander, 2 Swab. T. 95, the full English divorce court refused to believe those who professed to be eye-witnesses to an adultery committed by the defendant where there was no other evidence of any adulterous desire upon her part. And so, here, I cannot say that the evidence in this case satisfies the rule as to the measure of proof which is to be gathered from the cases already reviewed.
This case should never have been commenced upon the facts proved, or, rather, assumed to have been proved, for the purposes of this opinion, because many of them might have been disproved had the defendant been called upon to develop her defense. Perhaps the petitioner had ample ground to suspect his wife's fidelity, but his counsel should have advised him of the weakness of his case, and if there was substance of his suspicions a more patient surveillance would have resulted in more substantial proofs. As Vice-Chancellor Van Fleet said in the Culver Case,supra:
"Adultery is always clandestine; it is generally committed in secret, and it rarely happens that direct proof of the fact can be obtained, but it is also true that parties living in adultery almost always, by their conduct towards each other, *Page 195 
so plainly indicate their true relations as to furnish highly satisfactory evidence of their crime."
So here. If the undoubted pleasure that this man and woman found in each other's companionship was not the result of innocent causes, the proofs would have then, or within a short time, been at the disposal of the petitioner.
I will advise a decree dismissing the petition, but without prejudice.