This is an application to set aside a decree nisi advised by me herein on January 10th, 1928 (Docket 63-629) and affirmed in103 N.J. Eq. 367, for reasons expressed in my opinion there reported. The reasons assigned for setting aside the decreenisi are (1) deception of the court by the petitioner in the main case; and (2) adultery by the petitioner since the entry of the decree nisi and before final decree.
I will consider these reasons in the order stated:
 I.
The petition for divorce which resulted in the decree nisi
was based upon charges of extreme cruelty, one of which charges was of an "unjust accusation of infidelity." Before the parties separated on October 1st, 1926, there had been considerable controversy between them over an alleged undue intimacy between the petitioner and Leona F. Hass, a young woman then in his employ and now twenty-five years of age. The petitioner's age is fifty-three. Mrs. Pfender had become insanely jealous of Miss Hass and had tried to arrange a meeting with her to discuss the affair but it was prevented by Mr. Pfender. At the hearings in the main case which were held during November and December, 1927, I was led to believe that the friendly relations between Mr. Pfender and Miss Hass were of but short duration and had then long since ended; that he then had no interest in this woman and that his wife's suspicions and jealousy were altogether unfounded. It now appears, however, from the admissions of Mr. Pfender and Miss Hass themselves, that shortly after the first trouble between Mr. and Mrs. Pfender over Miss Hass occurred, she, conceiving that she was the cause of the trouble, refused to go out to dinner and to the theatre with Mr. Pfender again, as she had done on several occasions, so long as he lived with his wife. Within about six weeks after this refusal Mr. and Mrs. Pfender separated and Mr. Pfender and Miss Hass then resumed going out together and continued doing so on an *Page 109 
average of two or three times a week until the occurrence on June 30th, 1928, resulting in the charge of adultery to be hereinafter considered. During the course of the hearings on the main case, and both before and since, Mr. Pfender frequently remained overnight at the apartment in New York City where Miss Hass and her mother resided. It is plain now that Mr. Pfender's interest in Miss Hass never waned but has increased constantly to this day. The impression which I got at the trial on this point was undoubtedly due to a false atmosphere created by the attitude of injured innocence assumed by Mr. Pfender and supported by his pastor, Dr. Dougherty. Mr. Pfender testified in the main case that he had always told his wife all of his "goings and doings" and that he never concealed anything from her. It is now plain that he did not fully inform her with respect to his relations with Miss Hass, even assuming the truth of his wife's testimony concerning his admissions, which he denied.
At the conclusion of the former hearing I was under the impression that Mr. Pfender was then actually residing, and, since October 1st, 1926, had continuously resided with his pastor, Dr. Dougherty, at Glen Ridge, New Jersey. In paragraph 12 of his petition for divorce he says "he left his home and went to live with friends at Glen Ridge, New Jersey, where he has since then been residing." In paragraph 13 of his petition he says: "Your petitioner has not lived with the defendant since the date last mentioned but has resided with friends at Glen Ridge." The only friends at Glen Ridge with whom he ever lived were Dr. and Mrs. Dougherty. At the hearing on the main case the testimony was to the effect that "he had lived there for some time." At the hearing on this application, both Mr. Pfender and Dr. Dougherty testified that Mr. Pfender had resided at Dr. Dougherty's home constantly from October 1st, 1926, until the latter part of December, 1927. From the statement of residence in the petition and the testimony and attitude of the petitioner and his pastor, I assumed, and I think it was intended by them that I should assume, that this man, a vestryman in his church, whose life had been threatened by his wife, and who posed as having been unjustly accused by that wife of an *Page 110 
improper intimacy with a woman employe, had fled for refuge and safety to the home of his spiritual adviser, and had resided there under his protection and guidance ever since. This presented a picture likely to excite the sympathy of the court and was undoubtedly designed to have a controlling influence on its decision. That it did so is quite apparent from the reference to Dr. Dougherty's testimony in my former conclusions; but how different the picture here painted by the petitioner himself with the aid of Miss Hass! Instead of his being the embodiment of virtue and injured innocence which he then appeared, we find him at the very time of the hearings in the main cause, secretly seeking the company of and continuing his association with the woman who was the cause of the insane jealousy of which he complained; and so secret was this association that no hint of it was given during the trial, and even the petitioner's pastor, under whose roof he had taken refuge, knew nothing of it. The admitted facts are that this association had continued from the date of the separation, and, during the summer of 1928, Mr. Pfender's interest in Miss Hass, and his concern for her comfort had become so great that he suggested the renting of a larger apartment by the Hass family where he might also have a room. The testimony was to the effect that when he stayed overnight at the Concourse apartment he was obliged to sleep on a couch or sofa in the living room. Accordingly in September, Mr. Pfender, Miss Hass and her mother rented an apartment at 911 Walton avenue, New York City, into which Miss Hass and her mother moved on October 1st, and for which Mr. Pfender paid a part, at least, of the rent. A room was reserved in this new apartment for him, he moved part of his clothing and personal belongings there, and made the apartment his New York home, eating there as a member of the family and sleeping there two or three nights a week. At the time of the former hearing the situation was that Mr. Pfender was actually maintaining two residences, one at Dr. Dougherty's in Glen Ridge and the other at the Hass apartment at 911 Walton avenue, New York City; the one a technical residence for the purposes of the divorce action — not a legal requirement, but evidently to create atmosphere; the *Page 111 
other, his domicillary residence where, according to the elevator operator, he was known as "Mr. Hass." Dr. Dougherty says he did not know of this situation and did not know where Mr. Pfender was spending his nights when he was not in Glen Ridge. During the holidays, in December, after the decree nisi, Mr. Pfender gave up his room at Dr. Dougherty's and removed all of his belongings to the Hass apartment, and thereafter made that his only residence and domicile. After January 1st, 1928, Dr. and Mrs. Dougherty dined in New York and went to the theatre with Mr. Pfender and Miss Hass on at least two or three occasions. Even then the doctor remained in entire ignorance of where Mr. Pfender was living and saw nothing in Mr. Pfender's association with Miss Hass to excite his curiosity or suspicion, although Mrs. Pfender had previously, in a conversation with the doctor, charged this woman with being the cause of all her troubles. If the doctor's ignorance of Mr. Pfender's whereabouts and associations during the period preceding his moving from Dr. Dougherty's home was as sublime and complete as he would have the court believe, it must have been due to the fact that he deliberately closed his eyes and ears to a situation which should have been self evident to one in his position. It is, of course, of small consequence where Mr. Pfender had his real residence. The important fact is that I was led to believe that the relations between Mr. Pfender and Miss Hass were at an end when the fact was quite to the contrary. Whether or not the testimony of Mr. Pfender and Dr. Dougherty, the false atmosphere, or what not, was intended to deceive the court, it must have been apparent to the most casual observer at the main trial that that was the result. If so, it was the obligation of those responsible for that deception to undeceive me. The court may excuse honest error, but it cannot condone either deliberate deception or conscious silence in the face of plain mistake resulting from deception unintended. The statements of residence as contained in the petition are misleading, to say the least. A statement by the petitioner under oath that he told his wife fully about all his relations with his alleged paramour, and a recital of those relations in part only when a full and complete recital would have disclosed to the *Page 112 
court that he had not made a full disclosure to his wife, and that there were substantial grounds for her jealous suspicions and accusations, and that the association of which his wife had justly complained was continuing at that time, is a withholding or concealment of material facts which the court cannot overlook, and displays an attitude which does not commend a suitor to favor in a court of equity. If because of this circumstance the court was deceived, it matters not whether that deception was the result of passive or active conduct on the part of the suitor, providing the suitor is conscious of the result and willing to profit by it. That this is the situation here I have no doubt. That I erred in my judgment and appraisal of the petitioner at the former hearing is now plain to me, but "to err is human" and no court is infallible. It is the realization of this fact, and the concern by reason of it that cause men to break under the weight of judicial responsibility. But however deep the error into which a court of justice may fall, irrespective of the reasons therefor, the opportunity to correct it is always welcome. That it is my duty to correct my own error now, I have no doubt. Let it be understood, however, that there is nothing in this case to indicate any knowledge on the part of the petitioner's solicitors of his deception or misconduct in the cause, or of any connivance or participation in the petitioner's fraud and deception by his solicitors. Their reputation and standing at the bar preclude any thought or suspicion of misconduct on their part and I expressly absolve them from any charge or suggestion of it.
In Clickner v. Clickner, 95 N.J. Eq. 479, this court held that where a suitor in equity has been guilty of false or misleading testimony and conduct in the presentation and hearing of his cause, his suit will be dismissed irrespective of whether or not he might otherwise be entitled to relief. The rule of that case is plainly applicable here. This does not mean that the defendant's threat against the petitioner's life, and because of which the decree nisi was advised, was justified or in any sense excusable; it means only that the unconscionable conduct of a suitor in a matter in which he seeks relief will prompt a court of equity to remain passive. Newark Cleaning and Dye Works v.Gross, 102 N.J. Eq. 362. In *Page 113 Gluck v. Rynda Development Co., 99 N.J. Eq. 788; affirmed,100 N.J. Eq. 554, it was held that he who comes into equity for relief must not only enter with clean hands but must keep them clean after his entry and until the final determination of the issue, and this means until the final decree. One who by false or misleading testimony or conduct during the hearings in the cause deliberately deceives the court cannot be said to have complied with that rule.
 II.
The second reason assigned for setting aside the decree nisi
is the alleged adultery of the petitioner with Leona F. Hass at South Salem, New York, on the night of June 29th or early morning of June 30th, 1928. Both Mr. Pfender and Miss Hass vigorously deny this charge. Much of the testimony with respect to this occurrence is in sharp conflict and the defense makes much of the fact that the evidence supporting the charge was obtained by the payment of $10,000 to "Captain" Foster and his corps of detectives. Such payment is not denied. It is argued that the testimony of paid detectives, at best unreliable, is absolutely unworthy of consideration when obtained by the payment of such a large sum of money, which, of itself, is a sufficient inducement to witnesses of this character to shape their testimony to the needs of the case. But while the testimony of paid detectives is usually accepted with caution or ofttimes totally rejected when uncorroborated by disinterested witnesses, it is only fair to say that here all the really important testimony of these detectives is amply corroborated by disinterested witnesses or by the admissions of Mr. Pfender and Miss Hass themselves. I have already recited some of these admissions respecting the association of Mr. Pfender and Miss Hass, their dining and going to the theatre together, the renting of the apartment at 911 Walton avenue and Mr. Pfender's residence there, and these admissions need not be here repeated. It is further admitted, however, that with the passage of time the mutual attraction of these two for each other grew stronger and their affection increased to such an extent that early in the fall of *Page 114 
1927, and before the final hearing in the main cause, Mr. Pfender embraced and kissed Miss Hass with increasing frequency and they usually called each other "dear," a term of address not altogether usual between an employer and employe, and that even before the separation he gave her expensive presents. She finally gave up her position with his firm. She drove his automobile, which he kept in the city at a convenient garage. He admits that he was in love with her and while she says that until after the decree nisi he never told her of that love, yet her woman's intuition caused her to realize the fact that her affection was returned. She also says, however, that for a considerable period of time after the embracing and kissing began there was no thought on her part, or suggestion on his, of marriage, and that it was only after the decree nisi that he said, when he was free he intended to ask her to be his wife. In the spring of 1928 she became ill and went to Lakewood for her health and was visited there weekends by Mr. Pfender. On her return to the city, Mr. Pfender rented a furnished bungalow at South Salem, New York, for the summer season, where it was intended that he and the Hass family should spend the summer. They had all spent one night or one week end there prior to June 29th. At about eight o'clock on the evening of that date, Mr. Pfender and Miss Hass drove to South Salem, taking with them in the car articles of household use, besides their clothing. Mrs. Hass had intended going with them but after loading up the car it was found there was no room for a third passenger and she decided to remain in New York and go up by train later that evening. Mr. Pfender and Miss Hass arrived at the bungalow about ten thirty o'clock that night and busied themselves with putting away their clothing and the household articles which they brought with them until about one o'clock, when they retired. About eleven o'clock Mrs. Hass had called Miss Hass on the telephone and said it was storming in New York and that she would not be up that night. It did not then occur to either Mr. Pfender or Miss Hass that there would be any impropriety in their remaining in the bungalow alone that night although there was a hotel within two miles to which either one or both could have gone. *Page 115 
Mr. Pfender and Miss Hass were followed to South Salem by Mrs. Pfender, "Captain" Foster and his associates in another automobile. This coterie arrived there between five and six A.M. on June 30th, went to the bungalow, saw Mr. Pfender's car in the garage and being satisfied that Mr. Pfender and Miss Hass were in the bungalow, then went to a justice of the peace where Mrs. Pfender swore out a warrant charging Mr. Pfender with adultery. Then, accompanied by a constable armed with the warrant, they returned to the bungalow, knocked at the door and were admitted by Mr. Pfender, who was immediately placed under arrest. He was then clothed only in his pajamas and Miss Hass was in bed clothed only in her nightdress. After permitting Mr. Pfender to dress, the constable, accompanied by the rest of his party, took him before a magistrate where he was held under bail for a preliminary hearing. There were two bedrooms in the bungalow, one with a double, and one with a single, bed, the latter being termed Mr. Pfender's room. His clothing was in that room and he dressed there after his arrest. There is a sharp conflict of testimony respecting the condition of the beds in these two rooms. The detectives claim that the double bed in which Miss Hass slept showed unmistakable signs of having been occupied by two persons and that the single bed in the other room was made up and undisturbed, with Mr. Pfender's clothing lying thereon. This is vigorously denied by Mr. Pfender and Miss Hass. They say that both beds were occupied, the double bed by Miss Hass alone, and the single bed by Mr. Pfender, and that he was in that bed when he was awakened by someone walking on the gravel in front of the house, and that he sat up in bed, looked out of the window, and saw these men and Mrs. Pfender coming toward the house and asked what was wanted; that he then got up and admitted the party. Both bedrooms opened upon a living room and the doors to the bedrooms are separated only by the door frames which meet at a right angle. When Mr. Pfender and Miss Hass retired the night before they kissed each other good night, and, according to Mr. Pfender's story, they prepared for bed with the doors of their rooms open and they remained open all night. Miss Hass says her door was closed *Page 116 
while she was undressing but she partly opened it when she was ready for bed and that it remained so during the night. There is some question as to the manner in which the doors of the two bedrooms were hung. The door to Miss Hass' bedroom swings into that room, while Mr. Pfender claims that the door to his room opened by swinging into the living room, and that, consequently, when it was open it was impossible for anyone to see from one bedroom to the other. The door to Mr. Pfender's room does open into the living room now. The detectives claim that on the 30th of June it opened into the bedroom and that since then it has been rehung, so that it now swings into the living room. Admittedly there has been a change in the way it was originally hung, but Mr. Pfender says, and brings a witness to prove it, that it was changed at the time the bungalow was built. Much time was consumed by the taking of testimony of witnesses on this point, uselessly, as I think, for it is of small consequence how this door was hung. An open door, however hung, is but a slight barrier between two bedrooms occupied respectively by a man and a woman interested in each other as these two were, or inclined to commit adultery. Even closed doors have been known to yield to an undefended assault. The question which is presented to me under the admitted state of facts is whether under the rule of "inclination and opportunity" the charge of adultery has been proved. That the opportunity existed is admitted, but the inclinaton is denied.
That adultery by the petitioner for a divorce pending the running of the decree nisi will result in the vacation by the court of chancery of that decree, and in the dismissal of the petition for divorce, is well settled. Fuller v. Fuller,41 N.J. Eq. 198; Dolan v. Wagner, 95 N.J. Eq. 1; Helbig v.Helbig (Court of Errors and Appeals), 103 N.J. Eq. 348.
Direct proof of adultery is not required; but to establish it by inference the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion of guilt. Berckmans v. Berckmans, 16 N.J. Eq. 122; affirmed,17 N.J. Eq. 453; Culver v. Culver, 38 N.J. Eq. 163; Hurtzig v.Hurtzig, 44 N.J. Eq. 329; Luderitz v. Luderitz, 88 N.J. Eq. 103; Marchese v. Marchese (Court of *Page 117 Errors and Appeals), 98 N.J. Eq. 379; Johnson v. Johnson,99 N.J. Eq. 190.
As between the two interpretations of a given set of circumstances, equally consistent with probability, that inference which favors innocence should be adopted. (Italics mine.) Biddle on Divorce, p. 69; Berckmans v. Berckmans,Hurtzig v. Hurtzig, supra. It has also been held that, as adultery is a crime, a divorce proceeding based upon that charge partakes strongly of the nature of a criminal proceeding, and that, therefore, it is necessary that the guilt of the accused be proved beyond a reasonable doubt. Berckmans v. Berckmans,Marchese v. Marchese, Johnson v. Johnson, supra. This proposition is questioned by Biddle on Divorce, p. 69, citingState v. Sharkey, 73 N.J. Law 491, but the doctrine has been lately reasserted in Johnson v. Johnson, supra. It would seem to be an exception to the "preponderance" rule of evidence applicable to civil proceedings. It is certain, however, that the evidence must be so satisfying that the mind of the court will be free from "conscientious and perplexing doubts." Marchese v.Marchese, supra.
But to prove adultery by circumstances, criminal desire and an opportunity to gratify it need only be shown. Where these both concur, guilt is presumed. Berckmans v. Berckmans, supra;Black v. Black, 30 N.J. Eq. 228; Torrens v. Torrens (Courtof Errors and Appeals), 94 N.J. Eq. 480; 2 Bish. Mar. D. §619. This is what is commonly known as the "inclination and opportunity" rule. In the Helbig Case, supra, the court of errors and appeals said that under some circumstances there is a very practical difference in the application of this rule before and after the commencement of the nisi period, and that "circumstances and conduct on the part of a married woman living with her husband, enjoying his support and protection, and owing him, not only the actual, but also the seeming, loyalty of a true wife, might very properly furnish convincing proof of a guilty inclination on her part, while the same circumstances and conditions in the case of a wife, who, as here, has been deserted and abandoned by her husband for over two years, and in whose favor a divorce decree nisi has been granted, and who, consequently, owes him *Page 118 
no actual or seeming wifely loyalty of any kind, might very properly be construed to be entirely innocent and no proof whatever of such guilty inclination." It was there held that "to justify an order vacating a decree nisi and dismissing a bill for divorce during the running of such decree and before the final divorce decree has been entered, because of adultery, committed during that period by the party holding the nisi
decree, the adultery must be established with the same degree of certainty that would be required because of that offense to justify or defeat, as the case might be, a decree for divorce." The same degree of proof, no more and no less, is required. If both inclination and opportunity are shown, guilt is presumed; but after decree nisi, more proof of inclination would seem to be required under some circumstances. What circumstances demand greater proof of inclination must be determined by the court in each particular case as it arises.
In the case sub judice, the inclination or criminal desire on the part of Mr. Pfender and Miss Hass can be determined only by inference from their previous conduct. It has been said that facts in themselves inconclusive may be made conclusive by proof of falsehood or concealment on the part of the offender. 2 Bish.Mar. D. § 629. Pfender's relations with Miss Hass were certainly effectively concealed from everybody connected with this cause, even from Dr. Dougherty. Secrecy is a concomitant of a guilty love. Their attachment was no doubt a guilty one. It began while Pfender most certainly owed every duty of a husband to his wife and continued in secret throughout the whole period of the separation and during the course of the previous trial. Pfender's presents to Miss Hass, insufficiently explained, as I think, furnish strong suspicion of his guilt, and, in connection with other evidence, help establish the offense. 2 Bish. Mar. D. § 630. It has also been said that "the stronger the affection, the more perfect the concord, between married persons, the less likely is it that adultery will be committed." 2 Bish.Mar. D. § 621. Contrariwise, the less affection and the more discord between married persons, the more likely is it that adultery will be committed. There was an abundance of discord between the Pfenders. *Page 119 
The peculiar thing about the relations between Miss Hass and Mr. Pfender is that they can see nothing wrong in them. Mr. Pfender insists that he is a man of honor and that Miss Hass is a lady, and that all his attentions to her were grounded upon his love and affection; but love has spelled the doom alike of kings and fools, and it has been said that "love darkens reason, and confounds discretion." That a man of fifty-three and a woman of twenty-five might spend a night alone in a secluded bungalow without committing adultery, may be admitted; to deny it would be to deny the existence of virtue and honor. But in the instant case it could be the more easily believed if these two had not previously been on more intimate terms than the proprieties of everyday life admit; and we must not lose sight of the fact that, however honorable and virtuous they claim to be, they were still human and had not previously hesitated to indulge in amatory conduct likely to excite the baser passions, and this while one was an undivorced husband separated from his wife, and the other a young woman, the primary cause of that separation, and with full knowledge that her lover was not free to bestow his affections upon her.
It is with the probabilities of human conduct that we are here concerned and not with that of a superman or an ultra-virtuous woman, and these probabilities must be determined in the light of the former conduct of the parties. It is argued that if the conduct of these parties admits of two interpretations, one of guilt, and the other of innocence, that which favors innocence should be adopted. The rule as laid down by Chancellor Green in the Berckmans Case is "where the conduct of a party admits of two interpretations, equally consistent with probability, the one involving guilt and the other consistent with innocence, the rule of evidence, as well as the dictates of justice, require that the interpretation should be favorable to innocence." (Italics mine.) In invoking the rule quoted, counsel ofttimes fail to appreciate the import of the italicized words. When the human probabilities, as contrasted with the human possibilities, are here considered, I do not think it can be said that the conduct of these parties admits of two interpretations equallyconsistent with probability. *Page 120 
I have carefully considered the evidence submitted on this application in the light of that submitted in the main case, and, with a full realization of my own fallibility, I have reached the conclusion that the requirements of the "inclination and opportunity" rule have been fully met, and that adultery was committed as charged, and I so find. The result is that the decree nisi will be vacated and the petition for divorce dismissed.