LILLIAN LOTZ, petitioner-appellant,

*v.*

LEONARD C. LOTZ, defendant-respondent.

[Submitted February term, 1941. Decided April 25th, 1941.]

*Mr. Alex Simpson,* for the appellant.

*Mr. Louis Bondy* (*Mr. Charles Frankel,* of counsel), for the respondent.

The opinion of the court was delivered by

PERSKIE, J.

The single question for decision is whether on the facts of the case the advisory master erred, as claimed, in advising a decree *nisi* which in part decreed that the marriage between the parties be dissolved on the ground that the husband had properly proved both inclination and opportunity on the part of the wife to commit adultery as charged.

On April 29th, 1938, appellant, the wife, filed a bill against respondent, her husband, for separate maintenance. By her bill, she charged that her husband had abandoned her and separated himself from her on March 9th, 1937, and ever since that day has refused and neglected suitably to maintain and provide for her.

By his answer, the husband denied that he "abandoned" his wife without justifiable cause; he justified his "separation" on the grounds that his wife "became intimate with men at times and places unknown * * * to him;" that she "remained away from the home until late hours of the night and morning, causing him pain and anguish;" that he endeavored to induce his wife "to desist from going out and becoming intimate with other men, but she refused to do so;" and although he separated himself from his wife, he has "at all times suitably maintained and provided for her." Additionally, the husband charged both in his answer, and by way of counter-claim, that his wife committed adultery with one William Thomae, in November, 1937, and at other times unknown by him, at No. 24 Stanley Terrace, Town of Union, Union County, New Jersey, and at No. 164 East Northfield avenue, in the Borough of Livingston, Essex County, New Jersey.

After reviewing the proofs adduced by the respective parties, the advisory master said: "I am convinced that both inclination and opportunity on the part of the (wife) to commit adultery with Thomae have been shown and I will find her guilty as charged." Accordingly, he advised a decree *nisi* which was entered dismissing the wife's bill and dissolving the marriage of the parties on the ground of adultery. Although the wife appeals from the whole decree, the argument here is limited to the contention that the proofs fail to support the holding that she was guilty of adultery.

Concededly, there is no direct proof of adultery. The proofs were directed to the end of establishing that the wife had both the inclination and opportunity to commit adultery as charged. The applicable law in such circumstances is well settled. The evidence must be convincing. Its probative quality must be such that it decidedly supports the charge of adultery. As frequently stated, it must be of a character to satisfy and leave the careful and guarded judgment of the court free from conscientious perplexing doubts as to whether the charge was proved. *Berckmans* v. *Berckmans, 17 N. J. Eq. 453; Luderitz* v. *Luderitz, 88 N. J. Eq. 103, 107; 102 Atl. Rep. 661; Pfender* v. *Pfender, 104 N. J. Eq. 107, 116;*

*144 Atl. Rep. 333;* affirmed, *105 N. J. Eq. 247; 147 Atl. Rep. 911; Danielson* v. *Danielson, 127 N. J. Eq. 41; 11 Atl. Rep. (2d) 23; Hight* v. *Hight, 129 N. J. Eq. 15; 17 Atl. Rep. (2d) 802.*

In light of these principles let us briefly refer to the facts. The parties were married on June 14th, 1910. One child, who died about ten days after birth, was born two years after the marriage. Apparently, the wife did not enjoy very good health. According to the husband, she was a "sickly woman;" she suffered from "neuritis," "rheumatism" and "sinus trouble;" she "always complained of one thing or another;" "off and on" she required "doctoring" for "a great number of years;" and she was also obliged, at one time to undergo an operation, and as a result of which she was obliged for some few months to be in bed with a steel brace around the entire upper part of her body. The husband further testified that beginning with the summer of 1935 he ceased to cohabit with her as man and wife and has not since that day cohabited with her.

Notwithstanding his increased obligation, under the circumstances, towards his wife, the husband, against the wife's will, admits that he left her on March 9th, 1937, and took up his living quarters at the Newark Athletic Club where he has since lived. He gave two reasons or explanations for so doing. (1) "Why, I found that she was coming home late in the evening. I questioned her about it and I didn't receive a satisfactory answer, and one thing led to another and there were bickerings about a Mexican divorce which she suggested. And I told her that I had no use for a Mexican divorce, and if I wanted to get a divorce of any kind I would get a divorce in this court." (2) "I wasn't sure of my standing in my home. I felt that my home was being impaired. And I had on several occasions, while I had no direct proof * * * that that seemed to always hover over me."

Notwithstanding his reasons of explanations, the husband beginning on or about March 18th, 1937 (after he learned that his wife attempted suicide by gas on that day) first paid his wife $20 a week and then reduced it to $14 a week. Left with a relatively sizeable home on her hands the wife took in

roomers and boarders. So their relationship continued until the wife filed the instant bill and then for the first time the husband charged his wife with adultery.

Let us briefly refer to the circumstances connected with the names of Pearlman, Elwood, Marschner and Thomae and which circumstances were held as sufficiently proving the charge of adultery.

*Pearlman.* The husband, with the permission of the advisory master, reached out for this incident which occurred in 1926. He testified that his wife came to him, revolver in hand and apparently desperate, and confessed that she had been going out with Pearlman and he had been blackmailing her and she could no longer pay. He gave her $35 and advised her to report the matter to the police. This was done and Pearlman was trapped while receiving the money. No charges were pressed against Pearlman but the wife sued and recovered the money she had loaned. He does not say that she confessed any improper relations with Pearlman. The wife's version is that she loaned Pearlman this money because he said he was in trouble. Upon his failure to repay she went to the wife of Pearlman and this so enraged him that he threatened to lie about her to her husband and break up their home. At all events, this incident caused no breach in, nor cessation of, the marital relations of the parties which then existed and thereafter continued to exist.

*Elwood.* This incident occurred in 1934 or 1935. The wife was in the habit of playing bridge with a group in the apartment of Mrs. Glase. There is in evidence a letter from Mrs. Glase to the wife, upbraiding her for walking into the bedroom of Elwood, a boarder in the Glase apartment, in the presence of an aunt of Mrs. Glase, who, the letter states, was shocked at the happening. This apartment was a small one, the bedroom opened directly off the living room, the door was open, and there were several persons in the living room, including the aunt. The wife was in the bedroom only a moment, going in there, she says, to adjust her hair and find a place to put away her wraps. At the hearing Mrs. Glase, whose name was Riley at this time, testified that she never saw any signs of familiarity between the wife and Elwood.

Nor did this incident disturb the marital relation of the parties.

*Marschner.* To check information received, the husband went on one occasion to the wife's home and saw Marschner's car in the garage early in the evening. Marschner was a sewing machine salesman and boarded with the wife for about two weeks. On March 18th, 1937, the husband received a telephone call from Marschner who told him that he had come to the wife's home concerning a sewing machine which she was buying and found the wife unconscious with the gas turned on. When the husband arrived he found the wife lying on a couch recovering from the effects of the gas. Marschner invited him to stay for supper; but he did not stay. The main features of this occasion are not denied. The wife says she became despondent because of financial troubles. Marschner says, and the husband admits, that a reconciliation was urged by Marschner, who denied any wrongdoing. It was on this occasion that the husband agreed to pay the wife $20 a week which he did for a while and then reduced it to $14 a week, retaining the difference towards paying the mortgage interest on the home.

There is no proof of incriminating conduct on the part of the wife in any of the three stated incidents. This brings us to the specific charges of adultery with Thomae. There is no evidence of affection between the wife and Thomae whom she first met in a business way and who became a boarder in her home and who was separated from his wife. The wife did some work for him on his books. Admittedly she had some social relations with him; she had gone with him to places of amusement, to picnics, to dinner, to a hunting party and to shore resorts for the day. Much is made of a photograph of the two in masquerade costume taken at a Halloween party. This picture was found on Thomae's desk in his office where it had been placed by an employe of Thomae, who found it in Thomae's car. Surely, neither one nor all of the stated incidents disclosed is proof of the charge of adultery. By her proofs, the wife stoutly denied the complaints and charges made against her by her husband.

True, the wife's association with Thomae was indiscreet

even though they were usually accompanied by others, and they always came home for the night. It is equally true that this association, and the fact that they were in the same house at night, precludes us from holding that the proofs do not support the finding that there was opportunity for them to commit adultery. But be that as it may, we search the record in vain for convincing proofs to support any inclination on their part to commit adultery. *Hight* v. *Hight, supra.* We are entirely satisfied that the proofs here utterly fail to meet or satisfy the stated tests to support the holding that the wife was guilty as charged of having committed adultery with Thomae.

Accordingly, the decree is reversed, with costs.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER, COLIE, DEAR, WELLS, WOLFSKEIL, RAFFERTY, HAGUE, THOMPSON, JJ. 15.